THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LYMAN SIKES, Plaintiff in Error.

*Opinion filed December 21, 1927.*

1. CRIMINAL LAW—*when a count charges involuntary manslaughter in careless use of automobile.* A count of an indictment that the defendant feloniously and unlawfully made an assault upon the body of a certain pedestrian with an automobile, which he unlawfully and recklessly drove upon the public street, by reason of which assault the pedestrian was killed, charges involuntary manslaughter.

2. SAME—*what is improper question on cross-examination.* In the prosecution of the driver of an automobile for involuntary manslaughter in killing a pedestrian the defendant should not be required to answer, on cross-examination, the question whether he had had any other automobile accidents, as an affirmative answer carries the inference that he is a careless driver.

3. SAME—*negligence, to be criminal, must be gross or wanton.* Criminal liability cannot be predicated upon every act carelessly performed merely because such carelessness results in the death of another, but negligence, to become criminal, must necessarily be reckless or wanton and of such a character as to show an utter disregard of the safety of others under circumstances likely to cause injury.

4. SAME—*what is gross, wanton and ordinary negligence in driving automobile.* As applied to the running of motor vehicles, gross negligence is that which has in it the element of reckless-

ness; wanton negligence implies disregard of the rules of diligence and reckless heedlessness of consequences; and ordinary negligence denotes a negative quality in the attention and discharge of a duty.

5. SAME—*when driver of automobile is guilty of manslaughter.* Where a person with willful and wanton negligence drives his automobile in a reckless manner, in utter disregard of the safety of others, and runs over and kills another, even though unintentionally, it will be manslaughter, and the negligence involved, which must be proved beyond a reasonable doubt, is criminal negligence.

6. SAME—*when instruction referring to criminal negligence is erroneous.* In the prosecution of a driver of an automobile for involuntary manslaughter in running over a pedestrian it is error to give an instruction to the effect that the defendant must be found guilty if the jury find that he was criminally negligent, as such instruction is likely to mislead the jury where no instruction is given explaining and defining criminal negligence.

7. SAME—*when instruction referring to section 22 of the Motor Vehicle act as to prima facie evidence should not be given.* In the prosecution of a driver of an automobile for involuntary manslaughter in running over a pedestrian, an instruction quoting, in substance, the provisions of section 22 of the Motor Vehicle act as to what is *prima facie* an unreasonable rate of speed should not be given, as it only tends to confuse the jury in deciding the question of guilt beyond a reasonable doubt.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WORTH E. CAYLOR, Judge, presiding.

ELLIS D. WHIPP, DWIGHT McKAY, and CHARLES P. R. MACAULAY, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, LEE R. LAROCHELLE, and JOSEPH H. NICOLAI, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was convicted in the criminal court of Cook county on the charge of manslaughter and brings the cause here for review.

The first count of the indictment charged that plaintiff in error feloniously and unlawfully made an assault upon the body of Charles Rechsteiner with an automobile, which he unlawfully and recklessly ran upon the public street, by reason of which assault Rechsteiner was killed. Under the statute involuntary manslaughter is the killing of a human being "without any intent to do so, in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner." The effect of the first count was to charge involuntary manslaughter. The second count charged a felonious assault with an automobile, by which Rechsteiner was killed. The jury found defendant guilty of manslaughter as charged in the indictment and found his age to be fifty-three years. As all of the testimony on the part of the People tends to establish involuntary manslaughter and not murder or voluntary manslaughter, no further attention need be given in this opinion to the second count of the indictment.

The People offered proof tending to show that Charles Rechsteiner left the home of his parents at 710 East Thirty-sixth street, in the city of Chicago, about 6:30 o'clock P. M. on January 7, 1926; that on January 8 the coroner's physician conducted a post mortem over the body of Rechsteiner and found cuts and bruises on the head, face, arms and chest and evidences of internal injuries, on which he based his opinion that Rechsteiner died by shock, due to traumatic injuries received. The State's evidence also shows that shortly after seven o'clock in the evening of January 7, 1926, a street car running south on Vincennes avenue, (or Vincennes road,) in the city of Chicago, stopped at Seventy-sixth street to discharge passengers. The conductor on the street car, Harry Hynes, testified that when the car stopped, two men who were passengers got off the rear end of the car; that an automobile came by at a rate of about forty miles per hour and struck one of the men, throwing him in the air about ten feet and he

landed between the sidewalk and the curb; that this was the only man whom he saw hit; that the automobile kept on going, and that he went over to the man who was struck and found that he was dead; that he came back to his car and gave the signal to the motorman to chase after the automobile that he saw, and that they came upon an automobile standing near Seventy-seventh street; that he and the motorman got out of the car and went to the automobile and there found plaintiff in error; that plaintiff in error's machine was standing still at the time. He described the automobile as having curtains on it and as being a two-seated car. He also testified that the front glass of the headlights was broken, and that the automobile was the one that hit the man at Seventy-sixth street. He gave as his opinion that plaintiff in error was intoxicated. He testified, however, that he did not talk to him but that he stood within arm's length of him.

Ella Schulte testified that she was driving behind the street car referred to, at a distance of about seventy-five feet, when another machine swerved in front of her and struck a man, throwing him to the curb; that she stopped and got out of her machine and took the man to the hospital; that the man she took to the hospital was named Benedict; that he seemed to be unconscious for a while; that she saw another man lying there about eighteen or nineteen feet further south than Benedict.

Benedict testified that as he was getting off the back of the street car, at the corner of Seventy-sixth street and Vincennes avenue, he was struck by an automobile and knocked unconscious.; that a lady picked him up and took him to the hospital; that while she was looking for his hat he heard her exclaim: "Oh! There is another man laying there!" That a Yellow cab came along and the driver took the other man into the cab and left with him.

Clarence Westerman testified that he was the motorman on the street car referred to; that after he had stopped at

Seventy-sixth street he heard a crash; that after he had
received a signal to proceed and had started the car the
conductor ran forward through the car and told him to put
on as much speed as he could; that he stopped alongside
the machine in which plaintiff in error was riding, which at
the time was standing still; that he got off the front end
with the conductor and a passenger who was on the car;
that plaintiff in error attempted to start his machine and
he told him to wait,—that he had killed a man,—but plain-
tiff in error started up his engine and witness turned the
key and took it away; that plaintiff in error asked him his
badge number four or five times; that he noticed the con-
dition of plaintiff in error and could smell liquor on him;
also that he made an examination of the automobile and
found the glass in the left headlight broken; that he kept
the automobile key until an officer came along on a motor-
cycle and he gave the key to him, and that he did not re-
member any cars passing his street car before he got to
Seventy-sixth and Vincennes.

Charles H. Blaul testified for the People that he was a
motorcycle police officer, and as a result of a call from the
station at Eighty-fifth and Green streets he rode to Seventy-
seventh and Vincennes, where he noticed an automobile
standing in the street near a street car; that he asked as
to the trouble and received the reply that "this gentleman
just killed a man down here;" that he examined the au-
tomobile, which was a Cadillac roadster, and that he later
found that it belonged to the plaintiff in error; that he
found the left front headlight had been broken and the
bumper and left side of the car had been brushed; that he
asked plaintiff in error if he had hit anybody, and he re-
plied "No;" that he took him to the police station, and
later on that evening plaintiff in error told him that he had
been at a funeral at Blue Island and was on the way back;
that he had stopped at some lodge hall on Sixty-ninth street
and Stewart avenue and had had a drink.   This witness

also identified a cap, which he testified a man named Halpin had given him on January 22, 1926, some two weeks after the occurrence at Seventy-sixth street. He stated on cross-examination that he would not say that plaintiff in error was intoxicated but stated that he was not intoxicated; that if he had been he would have booked him in the station under another section, but that he admitted he had had something to drink though he did not tell witness what it was.

Michael Cohen testified that on the evening of January 7, 1926, he was driving south on Vincennes avenue and at Seventy-seventh street he saw an automobile standing opposite a street car and several men standing by the car; that in the presence of plaintiff in error the street car man told witness that plaintiff in error had struck two people at the intersection of Seventy-sixth street and Vincennes; that the motorman had taken the automobile keys and kept them until the police arrived; that one of the men asked witness to back up and take the injured man to the hospital; that he backed up to Seventy-sixth street and found a Yellow cab alongside where the man lay on the sidewalk, and he helped them put the man into the Yellow cab and directed the cab driver how to reach Auburn Park Hospital. He was of the opinion that the man who was put into the taxicab was dead when picked up. He also testified on cross-examination that he was within a foot of plaintiff in error during the conversation with him and did not notice any liquor on his breath.

This was all the evidence in chief on the part of the People. Plaintiff in error offered a number of witnesses to show that his general reputation for being a peaceable and law-abiding citizen was good. He testified that he was a member of the real estate firm of E. C. Parmelee & Co.; that he had been in that business for over twenty-five years and had owned an automobile for several years; that about 12:30 o'clock on January 7, 1926, he got his car from the

repair shop of Krause Bros., at Forty-ninth and Wallace streets; that at that time the glass in one of the front headlights was broken and had not been repaired; that it was broken two days before, when his car struck an iron beam on a truck, and that at that time the lamp got slightly bent; that he requested the repairman to repair the headlight, but was told that the latter did not have a Cadillac lens. In this testimony he is corroborated by Krause, the repairman. He further stated that he went to a funeral on the afternoon of January 7 and about 4:30 on that afternoon drove to Stewart avenue and Sixty-ninth street, where he remained for about two hours; that on Sixty-ninth street, after leaving Stewart avenue, a car ahead of him slowed down while going under the Rock Island tracks and that he bumped into it; that his bumper struck the rear bumper of the car in front but that no damage was done; that from there he went on Wentworth avenue to Seventy-third street, where he followed a street car; that he passed the street car at Seventy-fourth street; that somewhere near Seventy-seventh street an automobile ahead of him slowed up, and he applied his brakes suddenly and stopped the engine; that he found he had been running with the choke open; that his battery was low and he could not start the car, which was standing on the street, and a street car came up and two or three men jumped out and said that he had killed a man; that after passing the street car at Seventy-fourth street he did not pass any other automobile and that he did not strike anybody with his machine, and that he was driving at a speed of eighteen or twenty miles per hour. On cross-examination he was asked if he had had any other accidents previous to the ones he had mentioned. His counsel objected and the objection was overruled, and he stated that he had. On being further asked when he had any other accidents, objection was made and sustained. He testified that he had taken two drinks of near-beer dur-

ing his stop at Sixty-ninth and Stewart; that on that morning, about eleven o'clock, he had one drink of liquor which he characterized as "moon." He denied having passed the street car at Seventy-sixth street.

The testimony of Nicholas Halpin was offered on the part of the People, apparently on rebuttal and without objection. He testified that he was in the plumbing business; that on January 7, 1926, he was on the street car herein referred to; that he saw the conductor run through the car, shouting to the motorman to speed up the car—that some man had just struck two men back there; that he got up and followed the conductor; that when the car stopped, he, with the conductor and motorman, got out, and while the motorman was talking to the plaintiff in error witness walked to the front of the car to see what kind it was and the number of it, though he did not take the number; that he did not notice the headlights or that there was anything wrong with the car; that he walked to the left side of the car, just to the front, and took a man's cap from off the running-board or fender, lying almost on top of the fender on the left side. He identified the cap offered in evidence as the one he there found. He testified that he later turned it over to a police officer. He stated that he attended the first session of the inquest over the body of Rechsteiner, held on January 8, and that he had the cap in his possession at that time; that the inquest was adjourned to January 22, following; that he did not tell anybody about having the cap until called as a witness at the adjourned hearing of the inquest, and on being asked, after he had testified, if his testimony given was all that he knew about the occurrence, he for the first time stated that he had picked up a cap on the running-board of plaintiff in error's machine; that the cap was in his store. He did not testify that he mentioned the cap to anyone prior to that time, and explains as a reason for not speaking of the cap or bringing it to the inquest that the cap was forgotten.

Plaintiff in error contends, first, that the evidence does not show that the party killed, if anyone was killed at Seventy-sixth street and Vincennes avenue, was Charles Rechsteiner, as charged in the indictment. There is no evidence in the record disclosing the name of the man who was picked up by the Yellow cab and taken from the scene of the injury. The Yellow cab driver was not put on the witness stand and nothing appears in the record to show what he did with the body picked up. There is no evidence in the record whatever directly connecting the body of Rechsteiner, upon which the coroner's physician conducted an autopsy, with the man who was picked up at Seventy-sixth street. The plea of not guilty put in issue all of the charges of the indictment. One of the material charges was that the person killed was Rechsteiner. The only evidence that in any way tends to connect him with this occurrence is the testimony of Halpin concerning the finding of a cap on plaintiff in error's automobile, which was identified as belonging to Rechsteiner. This testimony stands alone. There is no evidence that Halpin told the other men then present of having found a cap or that he showed it to them, although he testifies that he was there with the street car conductor, the motorman and the police officer for ten or fifteen minutes. None of these men testified to having seen the cap or heard of one being taken from the front of the automobile at that time. That any normal person would, under such circumstances, take a cap from the running-board of an automobile, where a charge is being made that the driver of the automobile had killed a man, and say nothing about it to anyone present at the time but put it into his pocket and carry it away, as Halpin testified he did, and thereafter attend two hearings of the coroner's inquest without mentioning the cap to anyone until asked at the second hearing if there was anything further that he knew about the occurrence, is a most unusual and unnatural circumstance, and we are of the opin-

· ion that Halpin's testimony was not sufficient to establish beyond a reasonable doubt that the plaintiff in error struck and killed Rechsteiner. There is no other evidence in the record that even tends to show that the man killed at Seventy-sixth street was Rechsteiner.

It is also contended that the court erred in requiring plaintiff in error to answer, on cross-examination, that he had had other accidents aside from those which he mentioned. Such testimony on his part necessarily carried the inference that he was a careless driver, and as criminal negligence is the gist of the offense in a case of this character it was error to permit this question to be answered.

It is also contended that the court erred in giving the seventh and eighth instructions on behalf of the People. The seventh instruction gave, in substance, section 22 of the Motor Vehicle act, providing that the driving of an automobile, under conditions and in places there specified, at a rate of speed greater than that there designated, shall be *prima facie* evidence that the person operating such motor vehicle is running at a rate of speed greater than is reasonable and proper having regard to the traffic and the use of the way, or so as to endanger the life or limb or injure the property of others. The eighth instruction told the jury that "every person driving on the public highway is under a legal duty to observe and exercise reasonable care in the control and management of his vehicle to prevent injuries to others; that every person is criminally responsible for the willful and wanton neglect or willful and wanton failure to perform that duty. If you believe from the evidence that the defendant in this case was driving an automobile at that time and place in question, and that at that time and place the defendant knew of the danger of the alleged collision with the deceased or other person, and the probable consequences which would flow therefrom, and if you further believe from the evidence that the defendant did then and there recklessly and neg-

ligently or wantonly run down and collide with the deceased without using such means as you believe from the evidence were reasonably at his command to prevent such running down or collision, then the defendant should be held penally responsible for the result of his negligence or willful omission of duty. The fact that the deceased himself at the time of the killing, if such was a fact, was himself guilty of negligence or want of care for his own safety would not of itself exculpate the defendant in this case if he himself was guilty of criminal negligence as explained in these instructions and as charged in the indictment."

The gist of the offense in a case of this character is criminal negligence. Negligence, to be criminal, must be gross or wanton negligence. Gross negligence is that which has in it the element of recklessness. Wanton negligence, as applied to the running of motor vehicles, implies disregard of the rules of diligence and reckless heedlessness of consequences. Ordinary negligence denotes a negative quality in the attention and discharge of a duty. Criminal liability cannot be predicated upon every act carelessly performed merely because such carelessness results in the death of another. Negligence, to become criminal, must necessarily be reckless or wanton and of such a character as to show an utter disregard of the safety of others under circumstances likely to cause injury. (*People* v. *Adams,* 289 Ill. 339; *People* v. *Falkovitch,* 280 id. 321.) The negligence involved, and which must be proven beyond a reasonable doubt, is criminal negligence. Where a person with willful and wanton negligence drives his automobile in a reckless manner, in utter disregard of the safety of others, and runs over another and kills him, even though unintentionally, it will be manslaughter. (*People* v. *Camberis,* 297 Ill. 455; 1 Bishop on New Crim. Law, sec. 314.) Instruction 8 as given in this case closes with the reference to "criminal negligence as explained in these instructions and charged in the indictment." Criminal negligence was

not explained in the instructions given to the jury, and that instruction might well mislead the jury as to the character of negligence required to be proved and should not have been given.

In *Johnson* v. *Pendergast,* 308 Ill. 255, it was said that it is doubtful whether the average juror would understand the legal meaning of the term *"prima facie."* In *People* v. *Tate,* 316 Ill. 52, it was held that in a criminal case, where the defendant introduces evidence disputing the charge in the indictment, the question is whether the proof establishes the charge beyond a reasonable doubt, and under such circumstances no instruction as to what constitutes *prima facie* evidence should be given. In *Grosh* v. *Acom,* 325 Ill. 474, it was also held that when the evidence is contradictory an instruction as to what constitutes *prima facie* evidence should not be given. We are of the opinion that the effect of instruction 7, concerning *prima facie* evidence of negligence as set out in section 22 of the Motor Vehicle act, served only to confuse the jury and should not have been given.

Counsel for plaintiff in error attempt to raise a constitutional question concerning the validity of section 43 of the Motor Vehicle act. This section provides the penalties for violation of the act. A case arising on that section is not before us, and such constitutional question is therefore not involved here.

Other questions have been raised, but this case must be re-tried and they are not such as are apt to occur on re-trial.

For the reasons indicated the judgment of the criminal court is reversed and the cause is remanded.

*Reversed and remanded.*