THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ERIC FRIESEN, Defendant-Appellant.

Second District   No. 76-567

Opinion filed March 8, 1978.

Robert D. Greenwalt, of Harold J. Spelman & Assoc., of West Chicago, for appellant.

Gene Armentrout, State's Attorney, of Geneva (Phyllis J. Perko and Robert J. Anderson, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

On March 19, 1976, a Jeep driven by the defendant struck and killed Beth Douglas, a 16-year-old girl. Defendant was charged in a three-count indictment with the offenses of reckless homicide (Ill. Rev. Stat. 1975, ch. 38, par. 9—3(a)), driving without driving lamps (Ill. Rev. Stat. 1975, ch. 95½, par. 12—201) and speeding (Ill. Rev. Stat. 1975, ch. 95½, par. 11—601). After a bench trial, the defendant was convicted of reckless homicide and sentenced to two years' probation, with the first 90 days to be spent in the county jail. (The court made no finding on the other charges.) The defendant appeals contending that (1) the trial judge's finding that Beth Douglas was not walking in the street when the defendant's vehicle struck her was contrary to the evidence, and (2) the fact that the defendant was driving with his main headlights off would not, by itself, suffice to support a conviction for reckless homicide, since the defendant had his amber parking lights on at the time of the accident.

Most of the facts are undisputed. The defendant encountered difficulty with the electrical system of the Jeep, a week before the accident. There was evidence that he made efforts to have the Jeep repaired and encountered no further difficulty with the Jeep's electrical system until the

night of the accident. On the evening of March 19, 1976, the defendant and some friends went to a party. Upon leaving the party in the Jeep, with three companions, the defendant noticed that the "amp meter" "was going down again." After turning onto Woodland Hills Road, the defendant turned off the main headlights in order to conserve the battery, but left the amber secondary or parking lights on. The defendant did not see any people or activity as he traveled south on Woodland Hills Road.

At all points in question, Woodland Hills Road runs through a residential subdivision, and is intersected in succession (from north to south) by Trillium Court, Foxglove and Meadowrue Streets. Woodland Hills Road curves slightly to the right in the block between Trillium Court and Foxglove, and declines slightly in elevation. The road "curves around and goes down" to the left, between Foxglove and Meadowrue, in what a police officer, testifying for the prosecution, indicated was a "blind drop." Between Foxglove and Meadowrue, on Woodland Hills Road, is the home of Mr. Ralph Beck. The intersection of Woodland Hills Road and Meadowrue cannot be seen from that of Foxglove and Woodland Hills Road, and the area in front of the Beck residence is not visible from the area east of Woodland Hills Road and north of Foxglove. The speed limit on Woodland Hills Road is 30 miles per hour. There are no sidewalks in the area. The defendant had been on Woodland Hills Road once or twice before the accident, although never at night.

The road was dry on March 19, and the moon was out, supplying some illumination. There were no street lights in the area of the accident. The defendant testified that the amber parking lights illuminated approximately two car lengths in front of the Jeep, and that he could probably see light colored objects a couple of hundred feet in front of him; the Jeep parking lights were visible from a distance of over 2000 feet.

Shortly before midnight, as the defendant pulled onto Woodland Hills Road, Beth Douglas and Kathy Masters were walking south, down and along Woodland Hills Road. Beth Douglas was wearing dark clothing, while Kathy Masters had on a "camel" colored coat. As they reached the area in front of Ralph Beck's home, Kathy Masters heard a loud screeching noise; Beth Douglas was to her right and slightly in front of her when this occurred. Kathy Masters yelled for Beth Douglas to "watch out," and then jumped to the right. As she was falling, she heard a loud noise as the defendant's Jeep struck Beth Douglas; Kathy Masters did not see the Jeep, until after the impact. The body of Beth Douglas was carried approximately 119 feet; she died from multiple internal injuries at 12:26 that night. The only evidence as to speed was defendant's testimony that he was traveling approximately 30 miles per hour.

The only important factual issue at trial concerned the position of Beth

Douglas at the moment of impact. The State's contention was that the defendant's Jeep struck Beth Douglas as she was walking across Mr. Beck's driveway, some distance in from the curb and street, while the defendant testified that when he first observed the victim, she was six or seven feet into the street from the curb. The State based its contention upon the testimony of Kathy Masters, who stated that the girls had been walking in the grass, next to the curb, along Woodland Hills Road, and that she was crossing Beck's driveway, two feet in from the curb, between Beth Douglas (who was immediately to her right), and the street, when she heard the loud noise of the defendant's Jeep. The trial court found that the two girls were walking "in an area consistent with the testimony of Miss Masters" at the time of the incident, and the defendant contends that this finding was against the manifest weight of the evidence.

Much of the evidence tended to cast doubt upon the proposition that Beth Douglas was in Mr. Beck's driveway, at the moment of impact. Kathy Masters' testimony that she and Beth Douglas walked in the grass, next to the road, between Trillium Court and Foxglove, was contradicted by that of Frank Hoban, a 12-year-old, who was in a tree house with two friends, who observed the two girls walking side by side in the street, south on Woodland Hills Road, near Foxglove. Also, one of Beth Douglas' shoes was found a short distance south of Mr. Beck's driveway, three or four feet into the street, and while it is quite possible that the shoe came off at some point after the impact, it is perhaps more likely that the shoe was removed by the impact itself, and provided an indication that the impact occurred in the street. Kathy Masters' action after hearing the noise of "something coming fast," of shouting a warning and violently throwing herself out of the anticipated path of the vehicle, seems incongruent with her testimony that she was in Beck's driveway, since a pedestrian who is not in the road would normally perceive no danger from traffic on the roadway and would not reasonably anticipate that a vehicle approaching at a "fast" rate, would turn into a driveway.

More importantly, there was a newspaper box on a pole at the northeast corner of the Beck driveway, next to the street, which was untouched by the Jeep, and the police officer who examined the driveway and lawn on either side of it, found no tire marks and concluded that no car had been driven on the lawn. While the width of the driveway does not appear of record, it may be inferred from certain testimony by Mr. Beck that it was less than 23 feet wide. Thus, a radical and unexplained maneuver at 30 miles per hour, going over the curb and onto the driveway, but missing the newspaper box, and then turning off the driveway while avoiding the lawn, all without leaving tire marks, would have been required if the point of impact were, in fact, on the driveway where the State contends. It is notable that the only one of the passengers in the defendant's Jeep

who testified, Scott Rogers, did not mention such a maneuver, and when asked whether he felt that his body was "propelled forward" prior to the impact with Beth Douglas, responded that it "wasn't really noticable at all."

■■ Further, the defendant's testimony that Beth Douglas was in the road, when he first observed her the instant before the impact, is not necessarily inconsistent with Kathy Masters' testimony that Beth Douglas was in the driveway when the girls heard the approaching vehicle. It is conceivable that during the seconds between the time that Kathy Masters last observed Beth Douglas and the instant of impact (which Kathy Masters did not observe), Beth Douglas, like Kathy Masters, jumped, but in the haste of the moment, jumped in the wrong direction—into the street. The possibility was conceded by Kathy Masters during cross-examination:

"Q Now, when Beth was hit—that is, just the split second before she was hit, was she in the roadway?

A I really can't say because when—before she was off the curb, and I didn't see her."

Thus, taken as a whole, the State's proof that Beth Douglas was in Beck's driveway, away from the road, at the time of the impact, was unsatisfactory, under the standard of proof applicable to criminal trials. This brings us to the question of whether the State's proof would suffice to sustain a conviction for reckless homicide, if Beth Douglas was in the street, as the defendant testified.

The defendant has cited *People v. Lynn* (1943), 385 Ill. 165, in support of his contention that his act of driving with no headlights would not, by itself, suffice to support a conviction for reckless homicide. In *Lynn*, the defendant was convicted of involuntary manslaughter with a motor vehicle. The defendant had been driving a truck, when the truck lights failed. The defendant attempted to pull the truck off the road, but was unable to do so because of a ditch. An automobile collided with the rear end of the truck and a passenger in the automobile was killed. The supreme court reversed the defendant's conviction, holding that criminal liability does not attach " 'where circumstances and conditions beyond the control of the accused' " caused him to be " 'in position and under the conditions' " which resulted in the death of the auto's passenger. (385 Ill. 165, 175.) However, *Lynn* is completely distinguishable from this case. Here, the Jeep headlights, though causing a drain on the battery, due to a fault in the vehicle's electrical system, were operational at the time of the accident and were turned off merely to allow the defendant to be assured of arriving at his next destination without difficulty. Given the sudden mechanical failure, the accident in *Lynn* was unavoidable. In the instant

case, the defendant was clearly negligent and it is possible that but for his negligence, Beth Douglas would still be alive.

■■ Nonetheless, the gist of the offense in this case is not merely negligence, but criminal negligence. As the court noted in *People v. Sikes* (1927), 328 Ill. 64, 74:

"Criminal liability cannot be predicated upon every act carelessly performed merely because such carelessness results in the death of another. Negligence, to become criminal, must necessarily be reckless or wanton and of such a character as to show an utter disregard of the safety of others under circumstances likely to cause injury. [Citations.] The negligence involved, and which must be proven beyond a reasonable doubt, is criminal negligence."

Cases of this kind obviously turn upon the particular facts in the case. However, the facts in *People v. Crego* (1946), 395 Ill. 451, are sufficiently analogous to provide some guidance. In *Crego*, the defendant struck and killed a man riding a bicycle. The defendant was driving at 45 miles per hour, at midnight, with his parking lights on but without headlights. Tests showed that the parking lights were visible at a distance of 780 feet (considerably less than the Jeep parking lights in this case). The court held that, "[i]n the absence of proof that defendant had notice of or reasonable opportunity to know that he would encounter a bicycle, without a light or reflector, at midnight near the middle of a lightly traveled country road, it cannot be said that he was guilty of criminal negligence," and reversed the defendant's conviction for involuntary manslaughter. (395 Ill. 451, 461.) In this case, the residential character of the neighborhood meant that there was a higher probability of defendant encountering a pedestrian, than on the lonely country road which was involved in *Crego*. On the other hand, the defendant in this case was driving much slower than the defendant in *Crego*, and the hilly, twisting character of Woodland Hills Road rendered the road perilous to pedestrians in the road, even assuming that all of the vehicles using the road had their headlights on. Further, section 11—1007(c) of the Illinois Vehicle Code (Ill. Rev. Stat. 1975, ch. 95½, par. 11—1007(c)) provides that where no shoulder or sidewalk is available, pedestrians walking upon or along a two-way roadway, must walk only on the left side of the roadway, facing traffic. Thus, it would not have been entirely unreasonable for the defendant to have assumed that any pedestrians proceeding on his side of the road would be facing the traffic, and would be able to see the parking lights of his oncoming vehicle, and move out of the way. The lateness of the hour rendered an encounter with a pedestrian less likely than would normally be the case (which is one of a number of factors distinguishing this case from this court's recent holding in *People v. Griffith* (1978), 56 Ill. App.

3d 747). While the defendant must have realized that turning off the Jeep headlights created a risk, under the circumstances, the probability that turning off the headlights would lead to the Jeep hitting a pedestrian was insufficient to render the defendant's conduct "an utter disregard of the safety of others under circumstances likely to cause injury." *People v. Sikes* (1927), 328 Ill. 64, 74.

After a detailed review of the record, we are convinced that the State failed to prove the defendant's guilt beyond a reasonable doubt.

The judgment of the circuit court of Kane County is therefore reversed.

*Judgment reversed.*

NASH and WOODWARD, JJ., concur.