THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOE W. HARVEY, Defendant-Appellant.

Fourth District   No. 4—87—0440

Opinion filed September 14, 1988.

LUND, J., dissenting.

Daniel D. Yuhas and Lawrence Bapst, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald D. Bernardi, State's Attorney, of Pontiac (Kenneth R. Boyle, Robert J. Biderman, and Linda Cullom, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

After a joint bench trial in the circuit court of Livingston County, defendant Joe W. Harvey and codefendant Stephen G. Maxwell were convicted on April 17, 1987, of involuntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a)). On June 25, 1987, defendant was sentenced to 30 months' probation. This case concerns only the subsequent appeal of defendant, and the only issue he raises is the sufficiency of the evidence to support the conviction. We conclude the proof was sufficient for the circuit judge to reasonably have determined defendant's guilt was proved beyond a reasonable doubt. (People v. Collins (1985), 106 Ill. 2d 237, 478 N.E.2d 267, cert. denied (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Accordingly, we affirm.

The evidence must be examined in the light of section 9—3(a) of the Criminal Code of 1961, the relevant portion of which defines the offense of involuntary manslaughter as follows:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***." Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).

Our supreme court has observed that criminal liability does not attach to every act of negligence resulting in injury, or even death, but only to negligence of such a reckless or wanton characteristic as to show an utter disregard for the safety of others under circumstances likely to cause injury. (People v. Crego (1946), 395 Ill. 451,

458, 70 N.E.2d 578, 581.) The State asserts the proof supported a finding of defendant's guilt either directly or by accountability (Ill. Rev. Stat. 1985, ch. 38, par. 5—1). As we deem the evidence of direct guilt sufficient, we will not discuss the complicated question of accountability for an offense where the principal mental state involved is recklessness.

Only some details of the occurrence giving rise to defendant's conviction are disputed. The death of the alleged victim, G.H., a 15-year-old, 100-pound, 5-foot 2-inch resident of the Salem Children's Home (Salem), occurred at that institution on August 3, 1986, while counselors Maxwell, Stephen Elliott, and defendant were attempting to restrain him as punishment for disobedience. Salem is one of the several private institutions operated in the State which has evolved from an orphanage and foster home to a child-care facility for children suffering from conduct disorders that often result from a distressed home life. While Salem cares for children with various disorders, it and similar types of facilities are used by juvenile courts as last-chance placements in attempts to avoid placement with the Department of Corrections, Juvenile Division.

Salem, like others, is church-related, but, because most placements come through the Illinois Department of Children and Family Services (DCFS), and Salem is dependent to a large degree on State expense reimbursement, DCFS rules and regulations are applicable to the home operation. The Salem staff, then, is charged with the responsibility for many disturbed children. G.H. was one such child, with lower than average intelligence, a discipline problem, and who had previously required restraint.

On August 3, 1986, G.H. was sent to his room after lunch and directed to write sentences as punishment for misbehavior. Elliott gave G.H. a time limit to do the sentences and told him restraint would be used if he failed to comply. At 3 p.m., Elliott and defendant went to G.H.'s room, found G.H. had not written the sentences, and proceeded to attempt restraint. The defendant approached G.H. from the rear and, upon touching him, G.H. began swinging his arms and kicking wildly. At this point, both defendant, who had been a good high school wrestler, and Elliott attempted to restrain G.H.

G.H. was taken to the floor with defendant at G.H.'s back, and Elliott at his feet. Defendant was attempting to place G.H. in a basket-hold. In simple terms, this hold involves a counselor standing behind the youth, grabbing the youth's right hand with his left hand, and pulling it across the youth's chest, and then doing the same with the youth's left hand with his right hand. If further control is neces-

sary, the youth is brought to a sitting position. If the youth is trying to butt the counselor with his head, then the counselor would lean his shoulder against the youth's neck, forcing the youth's chin on his chest. Michael Kaufman, operations manager at Salem, testified the procedure does not include application of further pressure to the back of the youth being restrained.

G.H. then stretched out using his left hand to grab one of the beds. At this point, defendant had control of one of G.H.'s arms but not the other. Defendant was unable to loosen G.H.'s grip, so Maxwell, a supervisor who was standing by, came over and stepped on G.H.'s wrists. Soon G.H. released his hold on the bed, swinging his arm around and striking defendant in the face. Maxwell then laid down on G.H. with his sternum across G.H.'s upper body. The contact lasted only a few seconds, and G.H., in some way, was able to push Maxwell off of him. Maxwell got off G.H. and tried to control G.H.'s loose arm, but G.H. bit Maxwell's arm. Maxwell became angry and placed his knee on the side of G.H.'s neck. While Maxwell was doing this, Elliott was striking G.H. in the legs, and defendant was striking G.H. in the midpoint of his body with the side of his hand and forearm.

At this point, the three men apparently obtained control over G.H. They became aware he had urinated, and his eyes were closed. Elliott testified that blood trickled slightly from G.H.'s mouth. With the use of his knee, defendant raised G.H. to at least a sitting position and held him there for a short time in a basket-hold. Defendant was temporarily relieved by Elliott for a short time and then returned to hold G.H. In the meantime, Maxwell had left, obtained handcuffs, returned and placed the handcuffs on G.H. By this time G.H. was limp, and his eyes were closed. Mark Craig, another Salem employee, arrived on the scene and became concerned with the appearance of G.H.'s condition. Upon examination of defendant, the persons present discovered he was not breathing and had no pulse. Attempts at reviving G.H. failed because of large amounts of vomit in his mouth, throat, and air passages.

Other than the decedent, G.H., there were only five eyewitnesses to the struggle: Elliott and Phillip Hinton, a resident of Salem, who testified for the State; the defendant and Maxwell, who testified for the defense; and a Salem resident who was never called. The testimony of each conformed generally to the described facts we have related. Elliott had earlier been charged with murder but had negotiated a plea agreement whereby he pleaded guilty to battery and received a fine of $100 in exchange for an agreement to testify for

the State. He testified that, at the time Maxwell was lying on G.H., the minor twice complained he could not breathe. Hinton testified he entered the room where the struggle occurred when he heard yelling. He related he had arrived at the time G.H. had bit Maxwell and heard Maxwell ask G.H. if G.H. was ready to be put in restraint. According to Hinton, G.H. responded he was not ready and also complained he could not breathe, whereupon defendant struck G.H. several times in the stomach with the side of his fist and forearm. Elliott's testimony agreed with Hinton's that defendant was hitting G.H. in the stomach with the side of his hand or fist at that time, but he stated he did not hear G.H. complain about an inability to breathe except when Maxwell laid on him. Neither defendant nor Maxwell testified in regard to any complaint by G.H. concerning an inability to breathe. They were not questioned on the point. Defendant contended he hit G.H. in the side of his midsection rather than in the stomach.

Four physicians also testified. Dr. Larry Stalter, the physician for Salem, and Dr. Gregorio Manabat both attempted to treat G.H. when he was brought into the emergency room. Both found no indication of bodily injury sufficient to cause G.H.'s death. Both were of the opinion that he had died from lack of oxygen resulting from his vomiting under circumstances which caused his vomit to aspirate, i.e., to get into his wind passages, rather than to be eliminated through his mouth. Their opinions were based upon the large amount of vomit found in those areas. Dr. James D. Blanding, a board-certified pathologist, testified he performed an autopsy upon the decedent's body. He, too, found no indication of bodily injury and also concluded death resulted from aspiration. He stated that the body condition indicated no heavy blows had been administered, and the extent to which the vomit had penetrated the respiratory system indicated the decedent had vomited and aspirated before he died. On the other hand, Dr. Edward Shalgos, a forensic pathologist, testified upon the basis of information containing the facts we have described, presented in the form of a hypothetical question, that in his opinion, the deceased most likely died from shock, and, in the process, the vomit entered the air passages described.

In explaining his decision to convict the defendant, the trial judge emphasized his belief that G.H. had complained of his inability to breathe. The judge who heard and saw the witnesses was entitled to decide upon their credibility (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313) and could properly have concluded G.H. complained of his inability to breathe both when Maxwell was on top of him and when defendant was striking him in the mid portion of his

body. Although the evidence was undisputed that noticeable trauma to the stomach area did not result from this striking, the court could conclude defendant was hitting G.H. in the stomach. These alleged complaints of G.H. occurred in the context of a vigorous struggle between a 100-pound boy on one side and three adults weighing approximately 240, 150, and 150 pounds respectively on the other side.

We recognize the three Salem employees were withholding the use of maximum force and could easily have brought G.H. into restraint earlier had they elected to do so. We are also cognizant that the evidence showed G.H. had gone limp and feigned injury on previous occasions. We recognize the difficulty of the task assigned to them and to others in similar positions. However, G.H. had not attacked them until they attempted to impose restraint on him. Furthermore, no indication existed that he would have injured them had they let up on their attempts at restraint to check his ability to breathe at sometime before they finally subdued him. The evidence supports a determination by the trial court that, rather than doing so, defendant and others continued to struggle with G.H. to restrain him although G.H. had successively complained of an inability to breath on two occasions, closed his eyes, urinated in his pants, and gone limp. The trial court noted that so inattentive were defendant, Maxwell, and Elliott as to G.H.'s condition that they continued to hold him in restraint until Craig arrived and immediately warned them G.H. appeared to be in serious condition. The judge could have found from the evidence that the basket-hold by which G.H. was being restrained caused him to be bent forward to where his chest was nearly touching his legs.

Under the totality of the circumstances which the trial judge could have found to exist, the judge could properly have determined beyond a reasonable doubt that defendant's conduct of continuing the struggle and placing G.H. in restraint was likely to cause serious bodily harm to G.H. and that, after the complaints which defendant had received, his conduct showed an utter disregard for the safety of G.H.

We recognize the reluctance of courts of review to uphold convictions of involuntary manslaughter arising from a single act in cases involving the driving of a motor vehicle. This reluctance is exemplified by such cases as *People v. Potter* (1955), 5 Ill. 2d 365, 125 N.E.2d 510, *People v. Friesen* (1978), 58 Ill. App. 3d 180, 374 N.E.2d 15, and *People v. Chambers* (1972), 8 Ill. App. 3d 430, 289 N.E.2d 476, cited by defendant. We are also aware of *People v. Post* (1968), 39 Ill. 2d 101, 233 N.E.2d 565, where the conviction of a defendant was reversed. The defendant there killed an intruder when a warning shot,

fired by the defendant, ricocheted and hit the intruder. Here, the defendant's guilty conduct consisted of several acts which occurred after a complaint by the victim that he was endangered.

This case also differs from *People v. LaCombe* (1982), 104 Ill. App. 3d 66, 432 N.E.2d 672, where a conviction for involuntary manslaughter was overturned on review. That defendant had driven a truck into a school yard at night under circumstances where a passenger leaned out the window, lost his grip, fell out, and was run over. The driving of that defendant was not deemed to be such as likely to cause death or great bodily harm. Unlike here, in that case, there was no evidence the victim warned the defendant that he was in difficulty. We are also aware of the decision in *People v. Frary* (1976), 36 Ill. App. 3d 111, 343 N.E.2d 233. In that case, defendant followed a motorcycle at a speed of 75 miles per hour after he had drunk some intoxicant. The evidence was held to be insufficient to support a determination of recklessness, and his conviction was overturned. However, the opinion did not indicate that defendant was shown to be intoxicated. Thus, only the single illegal element of speeding was shown. Moreover, that decision was rendered by a different district of the appellate court of this State and is not binding on us.

For the reasons stated, we affirm the conviction and sentence of the defendant.

Affirmed.

McCULLOUGH J., concurs.

JUSTICE LUND, dissenting:

The majority agrees that conviction of involuntary manslaughter is conditioned on defendant's acts being "likely to cause death or great bodily harm *** and he performs them recklessly." (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).) They also conclude the initial encounter and the attempted restraint immediately after G.H. became violent were not such as to sustain the conviction. According to the majority, a point was reached, maybe when G.H. urinated and became limp, that defendant should have backed off. Reference is made to G.H.'s complaint about being unable to breathe, but this was before G.H. bit Maxwell and G.H. continued with his violence.

I find the evidence insufficient to sustain a conviction for the three reasons: (1) defendant's acts were not likely to cause death or great bodily harm, and he was not accountable for the wrongdoing of others; (2) the defendant's acts were not done recklessly; and (3) at

the time the majority believed defendant should have backed off, being after the urination and limpness, it was possible, if not probable, that G.H. was already dead.

I

It is well settled that the acts which a defendant does which caused the death must be such as are likely to cause death or great bodily harm to some individual when performed recklessly. (*People v. LaCombe* (1982), 104 Ill. App. 3d 66, 72, 432 N.E.2d 672, 676.) Defendant maintains the State failed to prove his conduct was likely to cause death or great bodily harm. The trial judge did not address this question in giving his decision.

The crux of this issue is the question of foreseeability. Only that result which is foreseeable as occurring due to the conduct of defendant is sufficient to sustain a conviction for involuntary manslaughter. Thus, if the death is not the likely result of a certain conduct, but, in fact, occurs due to unusual and unexpected circumstances which cannot be foreseen, then the conviction must be reversed.

In *People v. Post* (1968), 39 Ill. 2d 101, 233 N.E.2d 565, the evidence established that the defendant fired a warning shot into the ground to scare off a prowler. The evidence suggested the bullet ricocheted from the ground and killed the intruder. The supreme court noted this conduct was not *per se* reckless and was not likely to cause death or great bodily harm. It stated:

"While action of this young householder was not necessarily the exercise of best judgment, the protection of his family by firing a shot from a target pistol to frighten and discourage the return of a prowler is understandable. He could not reasonably foresee that his act was likely to result in serious injury or death." *Post*, 39 Ill. 2d at 106, 233 N.E.2d at 568.

In *LaCombe*, that court was faced with a similar question as to foreseeability. There, defendant drove a truck through a school yard late at night driving in circles. His passenger climbed up to lean out the window and, losing his grip, fell out and was run over. The court noted the crucial question was whether defendant's acts were likely to cause death or great bodily harm. After reviewing the facts and the case law, it determined that due to the victim's conduct, defendant's conduct was not sufficient to sustain a finding of criminal liability. (*LaCombe*, 104 Ill. App. 3d at 74, 432 N.E.2d at 677.) The decision was based on the fact that the defendant's conduct was not likely to cause the harm which occurred.

Before determining whether the evidence was adequate to sustain

the finding of defendant's guilt, a determination must be made as to defendant's accountability for the acts of others. The State asserts the defendant is at least guilty under the accountability theory because he aided and abetted Maxwell and Elliott.

Our court's decision in *People v. Mikel* (1979), 73 Ill. App. 3d 16, 19, 391 N.E.2d 558, 561, held that a person could not be guilty of involuntary manslaughter on an accountability theory. However, the State argues that this holding should be changed due to the supreme court's decision in *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746. The Second District used *Terry* to determine that a person could be found guilty of involuntary manslaughter on an accountability theory in *People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 493 N.E.2d 135. The court stated:

"In view of our supreme court's more recent opinion in *People v. Terry* (1984), 99 Ill. 2d 508, we believe *Mikel* was wrongly decided.

In *Terry*, the court held that under section 5—2(c), which incorporated the long established 'common-design rule' (*People v. Terry* (1984), 99 Ill. 2d 508, 514), the State need only prove that the defendant had the specific intent to promote or facilitate *a* crime, and not the actual crime for which he was charged. Once the State proved that the defendant intended to promote or facilitate *a* crime, he was responsible for *any* criminal act done in furtherance of the intended crime. Thus, where the defendant intended to promote or facilitate only a battery, he was legally responsible for the act of his codefendant in stabbing and killing the victim. The defendant did not have to intend that the victim be killed. Applying *Terry* to the present case, we agree with the court's decision in *Bolden* and hold that a person can be guilty of involuntary manslaughter on an accountability theory because he does not have to intend that the victim be killed." (Emphasis in original.) *Miscichowski*, 143 Ill. App. 3d at 655, 493 N.E.2d at 141.

The applicable accountability law is set forth in section 5—2(c) of the Criminal Code of 1961 as follows:

"A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev.

Stat. 1985, ch. 38, par. 5—2(c).)

Inherent in accountability is the intent to promote, et cetera, an *offense*. Regardless of *Terry* or *Miscichowski*, if the evidence did not show that the defendant intended to promote, et cetera, an offense, then accountability cannot be used to sustain a conviction.

When G.H. went "crazy," the initial conduct by the defendant, as indicated by all of the evidence, was to comply with the institution rules of restraining G.H. for his own safety, the safety of others, and the prevention of property damage. No criminal intent can be inferred from the evidence. To determine that based on the subsequent activities the intent of defendant changed to one of criminal intent would be pure speculation and certainly violative of the beyond a reasonable doubt test. The evidence does not justify holding defendant accountable for any criminal conduct of either Maxwell or Elliott.

It is necessary to determine whether defendant's own conduct was, by itself, likely to cause death or great bodily harm and performed recklessly. A further examination of the evidence is necessary.

The State's main witness as to the occurrence was Stephen Elliott. The following is a summary of his testimony.

Stephen Elliott worked at the home from February to August 1986 and was one of the participants in the incident. On the date in question, the children had been taken to church, had returned, and had lunch between 1 and 2 p.m. in the afternoon, eating some corn. G.H. was then sent to his room to write sentences, which was a punishment for having misbehaved. About 3 p.m., Elliott told G.H. that he had to have 15 sentences copied in the next half hour. He was told that he would be put in a restraint hold if he had not done them. At 3:30 p.m., Elliott, Maxwell, and defendant went to the room. G.H. had not completed the sentences. When he entered the room, G.H. started whimpering and said, "Well, I tried to do it." Elliott thought this was unusual because he had never seen G.H. whimper or cry before. At that point, they were going to administer the restraint hold. When G.H. stood up, defendant went around behind G.H. to get a hold of his arms. Defendant barely got a hand on G.H. before G.H. went crazy and started swinging his arms and kicking. At this time, he was forcibly taken down to the floor, with Elliott getting a hold of his feet, and defendant getting a hold of his abdomen. G.H. then stretched out using his left hand to grab a hold of one of the beds. At this point, defendant was partially underneath G.H. on the floor. He had control of one of G.H.'s arms, but not the other. Defendant had been a wrestler in high school and at one time finished in the top 10 in the State.

At first, defendant attempted to reach around with his arm to strike G.H.'s arm to loosen the grip. He was unable to accomplish that, so, Maxwell came over and stepped on G.H.'s wrist. He made a couple of quick steps on it. During this time, G.H. continued struggling. After G.H. released the bed, he was still swinging his one arm around and was striking defendant in the face. Maxwell then got down and leaned over G.H. to lie out on him to try to get some more control over him. Maxwell lay down with his chest area at his sternum across G.H.'s upper body. This contact lasted a matter of seconds. G.H. was still acting crazy, and he was, in fact, able to briefly buck Maxwell, who weighed 260 pounds, off the ground. Maxwell then got off and attempted to reach across and control G.H.'s loose arm. He got his right arm too close to G.H.'s mouth, and G.H. took a bite into Maxwell's arm.

At this point, Maxwell said something to the effect that you know what we do to biters in the Army, and then placed his knee on the side of G.H.'s neck. G.H. was still wiggling and struggling. Elliott was striking G.H. in the legs, and defendant was attempting to get G.H., who was supine, to bend over by applying some blows to his midsection. He was applying these blows with his forearm and the flat of his fist.

After G.H. bit Maxwell, Maxwell slapped him with an open hand several times to get his arm loose. Maxwell kept his knee in G.H.'s neck just a matter of seconds. Elliott admitted that he told the original investigators 10 to 12 seconds. The area of the neck would be just below the ear, straight down from the ear on the side of his neck. The only thing he ever heard G.H. say was *when Maxwell was on his chest*, say twice, "I can't breathe, I can't breathe." Maxwell then got up and left the room, and defendant and Elliott gained control of G.H. At this point, defendant noted that G.H. had wet his pants. As defendant started to bring G.H. up into a seated position, Elliott noticed his eyes were closed, and there was a slight trickle of blood down the corner of his mouth. Also, his tongue was laying on his lip, and his mouth was half opened. His head was pretty much straight up at that time. He believed he felt some slight movement in G.H.'s legs and upper body. After they got him into the seated position, Maxwell returned with the handcuffs, and they were placed on G.H. with his hands behind his back. Elliott thought this was unusual because he had never seen them used before.

He stated that in restraint, a staff member leans onto the back of the subject. Therefore, defendant got into that position behind G.H. and leaned on him. They were taught to put some pressure on the

subject's back, but not to bend them over so their knees would touch their nose. However, he did believe that defendant did not apply pressure out of the ordinary. Defendant maintained his position for a couple of minutes, and then Elliott relieved him and assumed the position. Defendant then came back and relieved Elliott.

G.H. had a habit of not responding when he was being disciplined either verbally or physically. Accordingly, it did not seem a concern when he was limp and quiet. Elliott repeatedly stated that he had never seen a kid so frenzied and berserk.

When the difficulty was discovered and G.H.'s mouth was first opened up, he did notice that there was a lot of corn and vomitus, and there was also a gurgling sound coming from him.

He remembered going to a meeting on February 10 because he had started work just six days before that. He had gone over the manual and was aware of the DCFS regulations.

On cross-examination, he acknowledged that he participated in basket-hold restraints which did not conform with DCFS guidelines, but he received the impression that he had authority from the administrators to do so. He never intended to hurt a child when he restrained him, nor did he view the basket-hold restraint as a means of inflicting pain. As soon as G.H. started acting crazy, Elliott's intent was to control him to keep him from hurting himself. He acknowledged that he had an obligation to try to get the children under control if they are out of control. Therefore, once G.H. started acting in the fashion he was, they had an obligation to attempt to control him. He also acknowledged they could have subdued G.H. much easier by different means. If it had been their desire to strike him or to do some other action which could possibly cause injury to him, they could have controlled him without all the wrestling and struggling that was involved. However, it was their intent to put him into the basket-hold to control him without injuring him.

Once G.H. was placed in the basket-hold, there was almost no pressure required to keep him in that hold. In fact, the main reason G.H.'s head was in proximity to his knee was because he was so limp and bent over and not because he was being pushed downward. He also believes that Maxwell's knee was only on G.H.'s neck for a period of three to four seconds.

Elliott was originally charged with murder. However, he acknowledged entering into a plea agreement with the State where he would plead guilty to the offense of battery and receive of fine of $200 in return for his promise to testify against the defendant. He also characterized defendant's striking of G.H. as not an intent to injure him,

but an attempt to get G.H.'s body to bend so that he could get him into a seated restraint position. He also agreed that the conduct of Maxwell, of placing his knee on G.H.'s head, was consistent with a effort to pin the head to the carpet and to keep him from biting anybody else.

The defendant's testimony, which was not in basic conflict with any other, is summarized as follows.

Defendant is 22 years old and had been attending Bible College. He started work on May 5, 1986, at the home in·order to acquire funds for his final year at school. He was never at a meeting concerning the regulations of DCFS. He only learned the procedure of the basket-hold from watching Elliott actually implementing it. He further remembers the meeting where Michael Kaufman told him and Maxwell that it was okay to implement the Brian Decker treatment on G.H. when G.H. was being noncompliant. (The Brian Decker treatment is evidently a modified basket-hold.)

On August 3, when he was going to G.H.'s room with Elliott, he was hoping that G.H. had, at least, made an effort to complete his sentences. If he had done so, it was his intention to let G.H. go without any discipline. After G.H. went berserk, he took him to the floor, but was unable to grab a hold of both arms. He had a hold of one arm, and G.H. was lying across part of his chest. He explained that his striking of G.H.'s abdomen was really an effort to make G.H. bend over. He was not really striking him but was using his arms in a scissors fashion in an attempt to get his arms together to pull G.H. into an upright position.

Also during the struggle, after Maxwell had gotten his arm free from G.H.'s bite, defendant reached up to move G.H.'s head away from Maxwell. At that point, G.H. bit defendant's knuckles. G.H. was so incoherent and yelling that it seemed to defendant he did not even know what was going on. Accordingly, defendant took his knuckles and tapped on G.H.'s forehead two or three times to get his attention. The action was similar to that used for knocking on a door. He was hoping to make G.H. focus so that he would be able to understand what was going on.

When he finally gained control of G.H. and put G.H. into the sitting position, he noticed G.H. was limp and did not resist. Defendant was kneeling behind G.H. G.H. was so limp that defendant was actually holding G.H. up. He noticed no movement or resistance by G.H. at this time. He was also talking to G.H. to see if G.H. was under control of himself. Defendant acknowledged his experience with wrestling in high school. He stated that he could have used a wrestling

hold to attempt to control G.H. However, he did not do that because he was afraid he would hurt G.H. or himself if he tried something other than the basket-hold. He further stated that on two previous occasions when he restrained G.H., G.H. had gone limp, would not talk, and pretended to be hurt. When he would release G.H., G.H. would get up and run away. Once G.H. was seemingly under control of Elliott and defendant, Maxwell obtained handcuffs, placing them on G.H.

State's witness Mark Craig testified as to what then happened. Craig, at the time of trial, was unemployed but was working at the Salem Childrens' Home at the time of the incident. He had been working there about seven months. About 3:30 p.m. on August 3, he stopped by to see Steve Maxwell. At that time, he observed G.H. in a restraint position. G.H. was sitting up with his legs straight out in front of him and his head approximately between his knees. He also observed that G.H.'s hands were behind his back in handcuffs. He thought this was unusual because he had never seen this done before. The people he observed restraining G.H. were defendant, Steve Maxwell, and Steve Elliott. They explained to him that they had permission to do the Brian Decker treatment on G.H. whenever they did not receive compliance. Craig left the room and returned a couple of minutes later. He told the people at that time that there was something wrong with G.H. He took the handcuffs off and started checking for vital signs. At that point, they noticed no vital signs, and CPR was commenced as an ambulance was called. During the CPR, Craig noticed that each time a compression was made on G.H.'s chest, a small amount of mucus mixed with corn and a little blood came out. When he first attempted to blow into his mouth, he had to scoop a large amount of vomit out of his mouth and throat.

On cross-examination, Craig explained that by physical restraint he meant intervening with the person when that person is either hurting himself, hurting others, or damaging property by putting that person in a basket-hold. He also explained the Brian Decker treatment. This was treatment given to a resident at the home named Brian Decker who was a particularly noncompliant resident. The only way Decker seemed to learn not to do something was by being restrained. He explained that it became a power control situation where you had to control him in order for him to comply.

Craig also explained that defendant and the others told him that when G.H. was restrained, it was his habit to go limp and shut himself down in order to trick the people who are restraining him. He also stated that defendant appeared to be doing nothing other than

the standard basket-hold restraint. Craig described the basket-hold as a position where a subject is sitting with his legs in front of him. His arms are in a crossed position across his chest, with a staff member behind the person holding his arms and just leaning forward on the subject's back. Craig did recall an instructor stressing that they were not to lie on the subject's back to the point where he was folded in half. When he was in the room, Craig observed that defendant was just barely leaning on G.H.'s back and that there was hardly any pressure at all. Even so, G.H.'s nose was close to his knees.

Returning to whether defendant's own conduct was, by itself, likely to cause death or great bodily harm, the answer must be no. Defendant's physical actions were by themselves well within proper bounds. He avoided use of holds he thought dangerous to G.H. *Any other determination would make it impossible to curb violence by residents in homes such as Salem.*

We next consider whether the evidence established that defendant was aware, or should have been aware, that there was conduct by Maxwell and Elliott which created an environment that elevated defendant's conduct so as to make it likely to cause death or great bodily harm. I emphasize that we are not dealing with criminal accountability.

The actions which principally stand out as being able to cause great bodily harm appear to be Maxwell's. Maxwell stepped on G.H.'s arm and laid across G.H., during which time G.H. made the statements that he could not breathe. Maxwell's arm was bitten by G.H. after he moved off G.H. Maxwell slapped G.H. to get free from the bite, and Maxwell put his knee next to G.H.'s neck. The blood from G.H.'s mouth, his limpness, and urination all appeared at the time restraint was finally imposed.

There is little evidence as to defendant's awareness of the specific actions of others and the significance of those actions. He was aware of G.H. bitting Maxwell and pushed G.H.'s head away from Maxwell. Considering the excitement and confusion, to charge the required knowledge to defendant by a finding of beyond a reasonable doubt would also be a result of pure speculation.

I also would find that the evidence does not establish beyond a reasonable doubt that the defendant's conduct was elevated so as to make it a cause of G.H.'s death. The conviction should be reversed.

## II

As to recklessness, our supreme court has observed that criminal liability does not attach to every act of negligence resulting in injury,

or even death, but only to negligence of such a reckless or wanton characteristic as to show an utter disregard for the safety of others under circumstances likely to cause injury. *People v. Crego* (1946), 395 Ill. 451, 458, 70 N.E.2d 578, 581.

The court in *LaCombe* cited various driving violations which did not justify a finding of recklessness. *People v. Frary* (1976), 36 Ill. App. 3d 111, 343 N.E.2d 233 (after drinking following a motorcycle at 75 miles per hour); *People v. Potter* (1955), 5 Ill. 2d 365, 125 N.E.2d 510 (speeding bus entering unmarked intersection); *People v. Chambers* (1972), 8 Ill. App. 3d 430, 289 N.E.2d 476 (improperly passed auto on right side of snow-covered road); *People v. Friesen* (1978), 58 Ill. App. 3d 180, 374 N.E.2d 15 (not using lights because of drain on battery and hitting pedestrian walking in roadway).

A similar conclusion is called for in the present case. Once G.H. had acted violently, there appears ample justification for defendant's initial attempts at restraint. The hitting in the abdomen area was done while defendant was under G.H., and was done with the back of the hand and forearm. The pathology report found no evidence of injury to the abdomen. G.H. was yelling and incoherent when defendant thumped his head with his knuckles. Finally, G.H. was put in the basket-hold position, and he was limp. The conduct of defendant, as shown by the evidence, even assuming knowledge of what Elliott and Maxwell had done, did not reach the level of recklessness. At what point should defendant have been required to stop his actions? Was it while G.H. was still violent? I say no!

The defendant, a young man working after his third year in college religious studies, was faced with a very difficult situation. After two months on the job, he was attempting to calm down a child gone wild. He did not want to injure the child. With hindsight, he could probably have used his wrestling skills, injured G.H., subdued him, and avoided the tragic death. The evidence does not sustain a finding that defendant's conduct was so reckless or wanton as to show an utter disregard for the safety of others.

### III

While the conviction should be reversed for the reasons already stated, further discussion is merited because of the cause of death. The majority would find that. a time arrived, during the encounter, when defendant should have withdrawn. Attention is drawn to the time when G.H. urinated and went limp.

The creditable evidence establishes death to have been caused by asphyxiation caused from, in layman's terms, inhaling vomit into the

lungs. There was no indication of the vomiting until resuscitation was attempted. In other words, sometime during that altercation, G.H. regurgitated his meal with digestive juices, but rather than expelling from his mouth or nose, inhaled part of the substances into his lungs. The evidence does not establish the cause of regurgitation. The cause of death was unusual, not anticipated, and possibly unforeseeable. The cause does indicate that G.H. may have been dead or close to death as soon as Elliott and defendant obtained control. The subsequent holding of G.H. by both Elliott and defendant and the handcuffing by Maxwell were not indicated as a cause of death. If death occurred prior to or at the time the defendant, in the majority's view, should have withdrawn, then defendant's subsequent conduct, not having caused the injury, cannot be used to sustain the involuntary manslaughter conviction.

To hold that the evidence was sufficient for a trial court determination of death after the urination and limpness amounts to adding facts not in the record. The defendant was not proved guilty beyond a reasonable doubt, and the conviction should be reversed without remand.