THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANTHONY A. LaCOMBE, Defendant-Appellant.

Fourth District    No. 17337

Opinion filed March 4, 1982.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

John P. O'Rourke, of Dukes, O'Rourke, Stewart, Martin & Helm, Ltd., of Danville, for appellant.

Edward Litak, State's Attorney, of Danville (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLS delivered the opinion of the court:

Reckless homicide.

But not only must the criminal conduct be *reckless*, it must also be *wilful and wanton*.

*Ergo*, we must reverse.

LaCombe was charged with reckless homicide, convicted by a jury, and sentenced to 2 years' probation.

### FACTS

The victim, Terry Lacey, was killed when he was run over by defendant's truck. The State presented the following evidence during its case in chief:

Carson Swinford lived in a house adjacent to the Northeast Grade School in Danville, Illinois. During the early morning hours of July 28, 1980, he was awakened by the sound of a loud car or truck engine. He proceeded to the bedroom window through which he saw a reddish pickup truck drive around the side of the building out of sight. He then went back to bed, having seen nothing unusual. The truck was not weaving.

Keith Stelzer, another neighbor whose house abutted the Northeast Grade School complex, was watching television between 1:30 and 2 a.m. His attention was distracted by the sound of a car or truck engine. He too looked out his window and saw a reddish pickup truck on the school

playground. The truck was driving without taillights or headlights. The truck moved around the school building out of Stelzer's sight. It was not traveling rapidly but he heard it "rev up" as if it were changing gears. Stelzer did not see the truck again but within two to three minutes heard sounds which seemed to him to be the opening and closing of the doors and the tailgate of a truck. Because Stelzer thought this conduct was suspicious, he called the police. He also stated it was not unusual for cars to drive on the field.

When the police arrived three to five minutes later, they asked him to accompany them to the athletic field. The grass was wet and Stelzer saw a number of tire marks on the field. He also testified that the truck was moving at 15 to 20 m.p.h. and that the noise from the engine was not caused by speeding. It was his opinion that the truck was not driving at a speed which would pose a danger to anyone. The truck was not weaving, doing circles, or "bobbing."

Robert Knapp testified that on July 27 he walked his dog on the athletic field. At that time there were no tracks in the grass or on the asphalt and no circular ruts on the ball field. The next day, when he again walked his dog, he saw numerous tire marks on the playground, on the ball field, and on the asphalt adjacent to the buildings. Though some of the tire tracks appeared fresh, Knapp could not say with certainty that all of them had recently been made.

Officer Michael Byrne received a call directing him to the Northeast school at approximately 2 a.m. on July 28. As he entered the playground area of the school in his police van, he saw a red pickup truck with the lights off leaving the playground. He attempted to follow the truck but because of a row of hedges, his vision was obscured and he lost sight of the truck for a few moments.

Byrne stopped his vehicle in an intersection and then saw movement at a house down the block from him. He backed his police van up to the house and saw defendant standing beside a red pickup truck.

When Byrne stopped, defendant came up to the van and told the officer in an excited voice that "Jack Terry is lying out there dying." Defendant was distraught and repeated the substance of this statement several times to the officer who tried to calm him down.

Because defendant was excited, Byrne placed him under arrest to keep him in custody until the officer could find out what had happened. Byrne detected a "fairly strong" odor of alcohol on defendant and, over objection, testified that he arrested the defendant for driving under the influence. The court then offered and gave a limiting instruction to the jury that this testimony could only be used for the purpose of ascertaining why the officer acted in the manner he did.

Byrne observed a large number of circular tire tracks which had been

cut into the athletic field by what appeared to be automobile tires. The marks were both straight and circular.

On cross-examination, Byrne admitted that he never saw the defendant driving the truck and that the truck was not being driven in a reckless manner when it left the field. Byrne also admitted that other than the smell of alcohol emanating from defendant, defendant did not exhibit any other signs of intoxication. Though Byrne took pictures of the various tire tracks he did not attempt to match these with any of the numerous emergency vehicles which drove onto the field that night or with defendant's truck.

C. L. McDougall, a footprint, tire, and fingerprint examiner for the IBI, testified that he had examined the tires of defendant's truck with the aid of a microscope. He compared these with the shirt which the victim had been wearing on the night of the accident. On direct examination he stated that it was his opinion that the tire marks on the shirt had similar class characteristics to the front tires of defendant's truck. That is, the marks were of a similar tread design. On cross-examination, however, McDougall was unable to say definitely that the marks on the shirt were identical to the tread design from defendant's front tires. McDougall had not made an examination to ascertain if specific markings from the tires correlated with those on the shirt. A motion to strike this testimony because there was no foundation tying the markings on the shirt to defendant's tires was denied.

Frederick Costigan, another police officer, located the victim on his back near the goal posts on the athletic field next to the school buildings. When found, Lacey was still alive though his pulse subsequently stopped. He was transported to a local hospital after CPR was administered. Costigan saw numerous tracks on the field produced by a vehicle which had been spinning around in circles while accelerating. Costigan, however, did not compare these marks with any of the tires of the vehicles which had been on the field that night.

Richard Adams processed the athletic field the day after the accident. He described the skid marks which he saw and he took plaster casts of several of the skid marks. Adams also obtained a search warrant for defendant's truck and seized its tires. The front tires were regular passenger car tires while the rear tires were snow or "mud lug" tires. Adams was unable to match any of the photographs of the tire tracks or the plaster casts with any particular tire from defendant's truck.

Dr. Grover Seitzinger, a pathologist, testified that the victim's chest was crushed. The cause of death was internal hemorrhage due to a torn heart which was caused by a force compressing the breastbone against the backbone.

William LaCombe, Jr., brother of the defendant, testified that the

defendant and Lacey, together with a number of others, had attended a birthday party for defendant at defendant's parents' home on the afternoon of July 27. At approximately 7:50 p.m., he, in a separate car, followed the defendant and the victim to a local tavern. Defendant was driving his red pickup truck.

LaCombe stayed with defendant at the tavern for two hours and saw defendant drink two beers. He also stated that the decedent and defendant were good friends and that there were no altercations between them on that night.

John Bolser, a friend of the parties, also lived in a house adjacent to the Northeast school yard. At 2 a.m. on July 28 he was awakened when he heard his dog bark and a voice calling out to send for an ambulance. Bolser went outside and saw the police. The defendant, who was standing with the police, told Bolser that Lacey was dying and pointed to the athletic field.

Bob Richard, a police officer, testified that he and Officer Byrne transported defendant to the police station. Defendant emitted a moderate alcoholic odor but did not otherwise appear intoxicated. Defendant passed several balancing tests which the officer administered.

After being given his *Miranda* rights, defendant asked for the opportunity to make a phone call. After several attempts, defendant apparently contacted his father. Richard was standing 10 feet from the defendant during the conversation. Defendant never asked Richard to leave the room.

Richard overheard the defendant's half of the conversation. Richard then told the jury that defendant, in response to an unheard question, stated into the phone:

> " 'It's serious. Can you get a hold of him.' * * * 'It's serious. It's more serious than that. I can tell you. Well, let's say I might have run over somebody.' "

The State then rested after the trial court, upon careful and detailed review, admitted each of the State's exhibits which consisted of numerous photographs of the Northeast Grade School together with plaster casts of certain tire tracks, the pickup truck tires, and the shirt worn by the decedent.

William LaCombe, Sr., father of the defendant, testified for the defense that the victim was a close friend of defendant. LaCombe was not sure whether defendant had consumed any alcoholic beverages during the course of the cookout, though he did not believe defendant would drink in front of defendant's small son. Defendant left the party at 7:30 p.m. Later that evening, LaCombe was awakened by a phone call. Defendant told him that "Terry has been run over and they think I did it."

Defendant then attempted to make an offer of proof that on prior occasions the victim climbed out of a moving car or truck being driven by these witnesses. Lacey would either climb into the rear of the pickup truck or onto the roof of the moving car. The vehicles were normally traveling at high rates of speed when this occurred. In all, the three witnesses testified to five such incidents in the last 10 years. The trial court concluded that this was insufficient to establish "habit" and denied admission of the testimony.

Defendant testified that he and the victim were close friends. He was with Lacey at the birthday party and left to go to a pig roast at a local tavern at approximately 7:45 p.m. Defendant and the victim stayed at the tavern for five hours. He and the victim then left and, after a short stop at another tavern, they decided to drive to Bolser's house to see if he was awake. When they approached the block where the school was located, defendant drove his truck onto the athletic field and cut his wheels hard, sliding the back end around so that his truck was facing Bolser's house in the distance across the field. Defendant opined that he was driving 12 to 15 m.p.h. at the time.

Defendant then drove across the field making a wide turn and drove back across the length of the field. During this process, he spun the truck around in circles on two occasions. Defendant had driven across the athletic field on a number of other occasions on go-carts or motorcycles but never with his truck. Though the headlights were turned off, defendant testified he had full control of his truck.

As defendant was driving in a straight line near the baseball diamond, Lacey told defendant that he was going to "ride the iron horse." Defendant thought that Lacey was talking about the mechanical bull at the State Fair because they had discussed that earlier in the evening. When defendant looked in the victim's direction, he saw Lacey climbing out of the window of the truck. At the point defendant first saw the victim the upper part of his body was outside of the vehicle. As defendant looked away, the victim's legs went out the window. All of this happened within a matter of seconds.

Within a short moment, defendant felt a "jump" in the right rear of his truck. He applied the brakes, looked in the mirror and saw Lacey lying on the ground. Defendant stated that he believed that he struck the victim with the right rear tire of his truck. Defendant went to the aid of Lacey and then drove to Bolser's house for help. Defendant stated that he was driving on the school yard for only two to three minutes before the accident.

Defendant and the other witness testified that the victim's reputation for carefulness was poor. A third witness testified that the victim's

reputation for carefulness was good. Although defendant was allowed to recall this latter witness after claiming surprise at his answer, his subsequent testimony that the victim was reckless and careless was struck by the trial court.

## ISSUE

■■ Among the issues raised by defendant is the question of whether he was proved guilty beyond a reasonable doubt. In a reckless homicide prosecution, the State is obligated to prove that the defendant caused the death by driving a motor vehicle recklessly and that he drove the motor vehicle in a manner likely to cause death or great bodily harm. (*People v. Boyle* (1979), 78 Ill. App. 3d 791, 396 N.E.2d 1347.) Reckless conduct alone is not sufficient to sustain a conviction; the reckless conduct must be wilful and wanton. (*People v. Ziegler* (1979), 78 Ill. App. 3d 490, 396 N.E.2d 1160.) The acts which a defendant does which caused the death must be such as are likely to cause death or great bodily harm to some individual when performed recklessly. (*People v. Bonzi* (1978), 65 Ill. App. 3d 927, 382 N.E.2d 1300.) Criminal liability does not attach to every act of negligence resulting in injury, or even death, to another person, but only to negligence of such a reckless or wanton characteristic to show an utter disregard for the safety of others under circumstances likely to cause injury. *People v. Crego* (1946), 395 Ill. 451, 70 N.E.2d 578.

■■ Upon a painstaking review of the record in this case we cannot say that there was sufficient evidence presented to demonstrate guilt beyond a reasonable doubt. While the evidence presents an extremely close factual question, we believe it raises a reasonable doubt which must be resolved in favor of defendant.

The evidence showed that defendant was driving on the athletic field in the early morning hours of July 28, 1980. During the course of this journey across the field, defendant drove the pickup truck in circles with sufficient force to tear up the wet sod. Though the police officers testified that it appeared that the driver had been accelerating during these turns, they were not able to establish any speed of the vehicle. Moreover, the neighbors adjacent to the school yard who saw the truck all testified that there was nothing unusual about the driving behavior and one witness estimated defendant's speed at 15 to 20 m.p.h. While a prudent jury could well conclude that there were sufficient facts presented to establish that this conduct was reckless, that finding alone cannot substantiate the verdict.

The crucial issue is whether defendant's acts were "likely to cause death or great bodily harm." The undisputed evidence showed that the victim, for reasons known only to himself, decided to climb out the

window of the moving truck. During the course of this maneuver which was accomplished in a few short seconds, the decedent apparently lost his grip and fell beneath the wheels of the truck. While we may properly condemn defendant's conduct, we cannot attach criminal liability to it if his reckless acts were not likely to cause the death, or if the victim's reckless conduct could not have been anticipated by defendant.

In *People v. Frary* (1976), 36 Ill. App. 3d 111, 343 N.E.2d 233, defendant was convicted of involuntary manslaughter and reckless homicide. He had been drinking in a bar sometime between 2 and 4 a.m. A friend arrived on a motorcycle seeking gasoline for an automobile stranded on the highway. Defendant offered to follow the victim to the stalled auto and syphon gas from the car tank. Defendant then followed the motorcycle at a speed of 75 m.p.h. As they approached a bridge beyond which the stalled car was located, defendant did not notice that the motorcycle driver began to slow down. The motorcycle driver lost control of the bike and defendant, who was three to four car lengths behind, swerved to avoid a collision but nevertheless ran over the motorcycle, killing one of the passengers and injuring another.

In reversing the conviction, the court stated that the only reckless conduct apparent with which defendant could reasonably be charged was failure to maintain a safe interval and driving in excess of the speed limit. On the facts, the court held that these were insufficient to prove beyond a reasonable doubt wilful or wanton conduct, recklessness, or criminal negligence.

In *People v. Potter* (1955), 5 Ill. 2d 365, 125 N.E.2d 510, the facts showed that defendant was driving a bus in Chicago. The bus was approaching an unmarked intersection into which a car drove at a right angle to the bus. Estimates of the bus' speed were between 45 and 50 m.p.h. The bus and the car collided in the center of the intersection and an occupant of the car was killed.

The supreme court concluded that the conviction could not stand because the uncontroverted testimony disclosed that the proximate cause of the collision could conceivably have been the unexpected conduct of the automobile driver in driving onto a main thoroughfare from a side street. It could not be said that the failure of the defendant to anticipate this action on the part of the automobile driver was reckless since the reckless conduct of defendant, if any, was only his driving in excess of the speed limit which constituted neither criminal negligence nor wilful or wanton misconduct.

In *People v. Chambers* (1972), 8 Ill. App. 3d 430, 289 N.E.2d 476, defendant improperly overtook an automobile in the right lane on a highway which was snow covered and on which only three of the four

lanes were open to traffic. After overtaking the car, and while defendant's automobile was over the center line of the highway, defendant's car skidded into the car he had just passed in the right lane and then veered into the left lane of the highway proceeding to a head-on collision. On appeal, the court held that the fact that defendant was guilty of improperly overtaking the car on his right did not establish that his conduct was reckless. The conviction was reversed.

In *People v. Friesen* (1978), 58 Ill. App. 3d 180, 374 N.E.2d 15, the evidence indicated that the headlights on defendant's car were operational though defendant drove the car with them off because they caused a drain on his battery due to a fault in the electrical system. The evidence also showed that he could have operated the headlights in that condition and that he could have arrived at his next destination without any apparent mechanical difficulty arising in the car. Although the court found that defendant was negligent in driving at night with only his parking lights on, the negligence did not rise to the level of criminal recklessness and could not support his conviction following the death of a pedestrian who was struck by defendant's vehicle. The evidence also showed that defendant was driving slowly and that the pedestrian was walking in the roadway on the wrong side of the street.

The only potentially reckless conduct which the State proved in this case was that defendant drove on the athletic field in circles with his lights off. While we cannot accept defendant's argument that a victim's negligence will, in all instances, relieve a defendant from criminal liability since the acts of the defendant and not the victim are those against which the standard of recklessness must be measured, we cannot say that driving in this fashion constituted either criminal negligence or wilful or wanton misconduct under the extremely close facts of this case.

We also cannot accept the State's argument that the opinion of Officer McDougall that the tire marks on the victim's shirt were similar to the class characteristics of the front tires of defendant's truck is proof beyond a reasonable doubt. The State's theory was that the front—not the rear—tires of defendant's truck struck the victim. In order for this to have occurred, the State theorizes that after the victim fell out of the window of the truck, defendant circled around and drove over him. Defendant testified that he was driving in a straight line when the victim left the truck and believed that he struck the victim with his rear tires.

■■ We do not agree with the defendant that the State's evidence was completely speculative. However, in view of McDougall's testimony that he could not specifically match the marks on the shirt with the tire tread, we conclude that a reasonable doubt exists in this regard upon which defendant's conviction cannot be sustained.

(Because of our conclusion as to the foregoing issue, we need not consider defendant's other claims of error.)

Reversed.

LONDRIGAN and TRAPP, JJ., concur.