THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO MEJIA, Defendant-Appellant.

First District (1st Division)    No. 1—89—3126

Opinion filed May 24, 1993.

MANNING, P.J., dissenting.

Randolph N. Stone, Public Defender, of Chicago (Frank Madea, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David Stabrawa, and Marcia G. Northrup, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant Antonio Mejia was found guilty of two counts of reckless homicide. The trial judge sentenced defendant to two concurrent four-year terms in the Illinois State Penitentiary. The judge also fined defendant $1,000 for the public defender's costs and charged him $140 for court costs. The issues defendant

raises on appeal are: (1) that he was not proven guilty beyond a reasonable doubt because the State failed to prove he was the driver of the car that caused the death of his two companions; and (2) that he is entitled to a new trial because his defense would have been different had his counsel been aware of several police reports which the State neglected to tender to defense counsel until after the prosecutor had presented his case. Additionally, we granted both sides in this litigation leave to file supplemental briefs on the issue of whether defendant was denied the effective assistance of counsel when, after receiving these reports in the middle of trial, defense counsel agreed to stipulate to the information in the reports instead of requesting another remedy.

Officer Michael Bennon testified that on April 18, 1987, at approximately 4:15 a.m., he and his partner, Officer Mark Juska, were stopped for a red light on Ogden Avenue at Milwaukee when they observed a 1971 green two-door Plymouth Fury (Plymouth) with three occupants traveling westbound on Chicago Avenue at a high rate of speed. According to Bennon, two of the occupants were in the front seat and one person was in the rear behind the front seat passenger. Bennon stated that the Plymouth went through a red light at Ogden, made a right turn and proceeded northeast on Ogden. Bennon testified that they pursued the Plymouth after turning on their "Mars" lights and their siren and activating the patrol car's flashing high beam. Bennon estimated that they were about 200 to 250 feet behind the Plymouth and that the Plymouth was traveling at approximately 60 miles an hour.

According to Bennon, the Plymouth swerved hard to the left across the northbound lanes over the double yellow line to the southbound lanes and to the south curb. Bennon stated that, as the Plymouth was about to hit the south curb, it swerved back across the southbound lanes toward the north curb. Bennon estimated that the distance between their car and the Plymouth was "about 100 feet, maybe a little less" when the Plymouth first hit the retaining wall on the north side of the street. Officer Bennon described this first impact in detail:

> "The vehicle struck the retaining wall. It bounced backwards, and it struck the wall again and, at that point, the vehicle, with the rear tires spinning, was turning to the side while riding along the wall."

Bennon then testified that the car spun around and "completely changed directions while up against the wall." Bennon estimated that, at the time the Plymouth turned while up against the wall, they were

within 30 to 50 feet of the Plymouth. He emphasized that "I had to brake the squad car so I didn't strike the vehicle." He stated that, after the Plymouth turned, they "were broadside to the car, in other words perpendicular to it" and could see the driver. He further testified:

"The vehicle again proceeded from the north side of the northbound lanes, the east side of the street, across the road, across the northbound lanes, across the southbound lanes, strike [sic] the retaining curb on the southbound lane side of the street, the west side of the street.

It jumped the curb, went up on the sidewalk and hit the pillars, the retaining wall for the pedestrians on the sidewalk at the end of the sidewalk. It came to rest there."

Bennon explained that, after the Plymouth came to rest, he stopped the patrol car about five feet behind the Plymouth. Bennon stated that they ran up to the driver's door and "observed the driver of the vehicle sliding over" to the passenger seat and attempting to exit through the passenger side door. According to Bennon, the damage from the accident prevented the door from opening, however, and defendant had to exit through the driver side door. Bennon stated that at this point he did not see any other people within the Plymouth.

Bennon further testified that, when defendant exited the Plymouth, his breath smelled strongly of alcohol, his eyes were bloodshot, he was having trouble standing, and his speech was slurred. Bennon said that as he placed defendant under arrest, Juska ran over to the two victims, who lay in the northbound lanes just south of where the Plymouth came to rest. Defendant had a broken arm and small cuts and bruises on his head and was taken from the scene in an ambulance. Bennon also mentioned that they got two or three different names from defendant because it was hard to understand him. He stated that "M-I-K-I-A" was one of the names and "M-I-K-A" was another.

On cross-examination, Bennon conceded that in a traffic accident report made several hours after the incident, he did not include as graphic a description of the accident as he did at trial. Additionally, Bennon asserted that they only lost sight of the Plymouth "very briefly" for only a second or two in an underpass as the patrol car was entering the pass and the Plymouth was ascending. Bennon also admitted that he and his partner, Juska, spoke with Officers Smith and Wesolek, major traffic accident specialists, at the hospital on the morning of the accident. He denied telling Smith or Wesolek or hear-

ing Juska tell Smith or Wesolek that both victims were front seat passengers. He also denied that he told either officer or heard Juska tell either officer that they were "300 feet behind the green vehicle when they lost sight of it where Ogden curves to the north." Moreover, he denied telling Smith or Wesolek or hearing Juska tell either officer that they heard a loud noise and when they got to the curve in the road they saw the Plymouth on the west side of the road up against the concrete railing.

On redirect, the prosecutor brought out that Bennon had checked the "yes" box on his field report next to the question "did you see the defendant driving?" Bennon had not checked the box next to the question "if parked, was defendant behind the wheel?" Bennon explained that this box is only checked if the officer did not observe the accident, but is called to the scene or comes upon a stopped vehicle. He stressed that the reason he did not check this box was "because I didn't come upon a parked vehicle. I saw the accident."

On re-cross, Bennon maintained that he never lost sight of the Plymouth as it was crashing, but admitted that he did not see either victim "fly from the car."

Officer Juska's testimony was almost identical to Bennon's testimony. He also described the accident in detail. He stated that the Plymouth struck the east side embankment and then turned 90 degrees and went perpendicular to them and across their path into the west side embankment. He testified that at that point they were approximately 30 feet away and could see into the Plymouth. He stated that he saw only the defendant in the car. According to Juska's testimony, defendant was in the driver's seat with his hands on the steering wheel. Juska said, however, that Bennon opened the passenger door to get defendant out of the Plymouth.

Dr. Yuksel Konakci, a Cook County assistant medical examiner, testified that both victims died from multiple internal and external injuries caused by extreme blunt trauma due to being thrown from the automobile during the crash. He also stated that tests upon both victims' blood indicated that they were both legally intoxicated.

After Dr. Konakci's testimony, the parties stipulated that blood was taken from "Antonio Mikia" who, in fact, is defendant Antonio Mejia, and the blood was transported to the Cook County medical examiner's office. Dr. Michael Schaffer, a forensic toxicologist, testified that the blood sample was analyzed and was found to have a .146 blood-alcohol content.

After Dr. Schaffer testified, the court granted a defense request to recall Juska. Juska admitted to speaking with major traffic acci-

dent investigators Smith and Wesolek both at the scene and at the hospital. Juska said he did not recall telling nor did he hear Bennon tell either officer that they were 300 feet behind the Plymouth and lost sight of it where Ogden curves to the left going northbound. He also denied telling Smith or Wesolek or hearing Bennon state to Smith or Wesolek that they heard a loud noise and when they got around the curve they saw the Plymouth already on the west side of Ogden up against the concrete railing.

The State then rested and the judge excused the jury for the day. The judge then conducted a short conference with both parties to discuss the course of the proceedings the next day. Defense counsel indicated that, in addition to calling the defendant and Raphael Samaniego, the prosecutor "had indicated that he would make available to us Officer Smith and/or Wesolek in order to clarify some of this." The trial judge incredulously responded, "Well, you're saying that the State is offering to attempt to get defense witnesses?" The prosecutor stated that Wesolek was on furlough and they would be unable to notify him, but that Smith had been notified. The judge reminded defense counsel that, although the prosecutor surely would make his best effort to get the defendant's witnesses in court, "it is the defense obligation to present witnesses."

The following day before the trial resumed and the defense proceeded with its case, the prosecutor tendered to counsel seven police accident reports which the defense had requested prior to trial. One of the reports was written by Officer Hanson, whom defense counsel was unaware of because he had not been mentioned in any of the previously tendered reports. These reports contradicted both Bennon's and Juska's testimony and indicated that they had not seen the accident. At the start of the day's proceedings, defense counsel made the substance of the reports known to the trial judge "because it may make somewhat of a difference eventually." He made it clear he was merely informing the court and he gratuitously conceded that the prosecutor was without blame. The relevant portions of transcript read:

> "[Defense attorney]: The reason I bring this up is only in the event that this—if there were to be a guilty verdict in this case. Judge, I have to complain about this and I—
>
> THE COURT: Fine, you're complaining. Fine, you're objecting. What action do you want me to take? Who do you want me to hold in contempt of court?

[Defense attorney]: I don't know that I want anyone held in contempt of court at all, but I do bring this up because, as I say, this changes our whole point of view.

I think—we made an opening statement that says we are going to produce certain witnesses. It is our belief that with this information, we need not even produce a witness.

\* \* \*

THE COURT: Well, you're bringing it to my attention, but you're not asking the Court to do anything.

[Defense attorney]: I ask for no remedy at this stage, Judge.

THE COURT: Well, you see, don't—don't lead me to believe that you're going to ask for a remedy later that I can't give to you.

I mean, if the defendant is found guilty, the normal things that flow after a felony case will take place. So, don't ask for any magical formulas that's [*sic*] going to erase something later. If you have a—if you have a remedy you want to suggest to the Court now, I—I'll consider it now.

[Defense attorney]: No.

THE COURT: I'm not going to do it three or four hours from now when you get a verdict that you don't like. That's too late.

[Defense attorney]: Our feeling is that we should proceed as we had planned, and I bring it up solely because it is important that I bring it up now.

THE COURT: Okay."

The prosecutor explained that about 1½ hours before at approximately 10:20 a.m., Smith came to his office because the defense had requested he be present in court. The prosecutor stated that, as he went through Smith's reports, he noticed seven reports that he did not have in his files. Recognizing that these reports may be *Brady* material, he immediately copied them and made them available to defense counsel. The prosecutor stated, therefore, that he was willing to stipulate to the information contained in the reports "so as to not delay this trial in any form." The defense agreed to stipulate "to the things that we want out of here."

The jury was then called back and the trial judge instructed them that a stipulation was a "time-saving" device where the testimony of the witnesses is not challenged by either party. Defense counsel then read the stipulation to the jury. It was stipulated that if Smith or Wesolek were called to testify, they would both state that immediately after the accident they interviewed Bennon and Juska and then made

out a police report. In that report they indicated that both of the victims were front seat passengers. Smith and Wesolek would also testify that when Bennon and Juska were chasing the Plymouth they informed communications that "due to the speed of the vehicle, [they were] about 300 feet behind the green vehicle when they lost view of it, where Ogden Avenue curves to the left to go northbound." They would further testify that Bennon and Juska "heard a loud noise and when they got to the curve in the road, they observed the green Plymouth on the west side of Ogden, up against the concrete bridge rail."

It was further stipulated that if Officer James B. Hanson was called to testify he would also state that he interviewed Bennon and Juska and that they indicated to him that they also made a report in which they indicated that they were "about 400 feet behind the vehicle and due to the incline and the curving of the roadway, [were] not able to observe the accident." Additionally, it was stipulated that "[b]oth officers also related they did not know if the driver, Mikia, it says, knew that a squad was pursuing them."

The defense then called the defendant as its only witness. Defendant testified that at approximately 5 p.m. on April 17, 1987, he and several friends, Jose Trejo and Raphael Samaniego, went cruising and drinking in a car that defendant borrowed from a co-worker. According to defendant, at approximately 10 p.m., they picked up Pedro Salgado. Defendant testified that they had just run out of beer so they stopped at a bar to get some more. Defendant stated that after they came out of the bar, Trejo took over the driving because "I wasn't in no condition to drive." Defendant testified that he lay down in the back seat on the passenger side. According to defendant, they continued drinking and cruising. About two or three hours later, at approximately 2:30 a.m., they dropped off Samaniego. According to defendant, Trejo was still driving. Defendant testified that at the time of the accident he was in the back seat on the passenger side. He stated that all he remembers is "the noise and flashing lights and a loud noise, and everything spinned [sic] around."

Defendant's first contention on appeal is that he was not proven guilty beyond a reasonable doubt because the State failed to show that he was the driver of the car that caused the death of his two companions. He asserts that Hanson's stipulated testimony indicates that Bennon and Juska lied when they stated that they observed the entire accident and that they saw defendant driving the Plymouth. Defendant maintains that this stipulated testimony in conjunction with defendant's denial that he was driving raises a reasonable doubt.

The responsibility of weighing the evidence, assessing the credibility of witnesses, and resolving conflicts in testimony is uniquely that of the jury. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, 473, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) In fulfilling its duty as the trier of fact, the jury "may believe as much or as little as it pleases of a witness's testimony." (*People v. Beasley* (1977), 54 Ill. App. 3d 109, 114, 369 N.E.2d 260, 264.) Our review of the sufficiency of the evidence, therefore, is limited to determining " 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' " (*Young*, 128 Ill. 2d at 49, 538 N.E.2d at 472, quoting *Jackson*, 443 U.S. at 318-19, 61 L. Ed. 2d at 573-74, 99 S. Ct. at 2788-89.) As has been so often stated, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *Young*, 128 Ill. 2d at 49, 538 N.E.2d at 472, quoting *Jackson*, 443 U.S. at 318-19, 61 L. Ed. 2d at 573-74, 99 S. Ct. at 2788-89.

In order for the State to prove defendant guilty of reckless homicide, it must show that defendant caused another person's death by recklessly *driving a motor vehicle* in a manner likely to cause death or great bodily harm. (Ill. Rev. Stat. 1991, ch. 38, par. 9—3; *People v. La Combe* (1982), 104 Ill. App. 3d 66, 72, 432 N.E.2d 672, 676.) In the instant case, after a careful review of the record in the light most favorable to the State, we cannot say that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt. The State and the defense never stipulated that Bennon and Juska lied; they stipulated that several other officers, if called to testify, would contradict Bennon's and Juska's assertions that they saw the entire accident and that defendant was behind the wheel. If the jury chose to believe the in-court testimony of Bennon and Juska, then the evidence was more than sufficient to support a finding of guilt beyond a reasonable doubt of reckless homicide.

Notwithstanding the fact that the evidence was sufficient to support a guilty verdict, we believe that had defense counsel called Smith, Wesolek and Hanson to testify in order to contradict the testimony of Bennon and Juska, instead of "saving time" by stipulating to their testimony, there is a "reasonable probability" that defendant would have been acquitted. When determining whether a defendant received the ineffective assistance of counsel, a reviewing court must be mindful that appellate review is governed by *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and

Illinois' adoption of *Strickland* in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246. These cases recognize that to succeed on such a claim, it must be shown that (1) counsel's performance fell below an objective standard of reasonableness, and (2) " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Albanese*, 104 Ill. 2d at 525, 473 N.E.2d at 1255, quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) In evaluating the performance factor, there is a strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance and that the challenged conduct might have been nothing more than part of counsel's sound trial strategy. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) In the end, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

Counsel's performance in this case fell below an objective standard of reasonableness which, as a result, seriously undermines our confidence in the outcome. In his opening statement, defense counsel stated that the evidence would show that defendant was not driving the Plymouth when it crashed. He told the jury that Raphael Samaniego would testify that, when he was dropped off at his house, defendant was not driving. Later, after the State rested, he again informed the trial judge that Samaniego would testify. Samaniego, however, was never called.

Additionally, the focus of defense counsel's cross-examination of both officers was that they had made statements contradictory to their in-court testimony to at least two other officers just after the accident. Counsel cross-examined Bennon by asking him whether he had ever told traffic investigators Smith or Wesolek that both victims were front seat passengers or that neither he nor his partner actually saw the accident. Bennon denied ever making these statements to Smith or Wesolek. Counsel also specifically recalled Juska in order to ask him these same questions. He also denied ever making them. The stipulation entered into between the parties establishes that both Smith and Wesolek would have testified that Bennon and Juska told them, in effect, that they had not seen the accident. The stipulation also demonstrates that both Smith and Wesolek had concluded that

both victims were front seat passengers. The record shows, however, that defense counsel had not subpoenaed either Smith or Wesolek and was relying upon the State to make these witnesses available when the defense presented its case. Wesolek was not in court and the record is unclear as to whether Smith was available. Nonetheless, the defense never called Smith or Wesolek and instead stipulated to their testimony.

Finally, the morning after the State rested and immediately preceding the presentation of defendant's case, the State tendered seven police reports to defendant. One of the reports was made by an Officer Hanson who had interviewed both Bennon and Juska after the accident. His report was consistent with the reports of Smith and Wesolek and contradicted Bennon's and Juska's assertions that they saw the accident and that defendant was driving. Defense counsel made the trial judge aware of these new developments, but refused to request a remedy. He stated that he was "bring[ing] it up solely because it is important that I bring it up now," but that he was sure that the prosecutor's nondisclosure was not willful and that he did not want any remedy. Instead, counsel agreed with the State to stipulate to Hanson's testimony "so as to not delay this trial in any form." After stipulating to the testimony of Smith, Wesolek, and Hanson, defendant got on the stand and denied driving the Plymouth when it crashed. The defense then rested. The stipulation was entered into the record, the morning after the State had rested, just before the defense put on the defendant as their one and only witness and after the jury had been waiting at least one hour for the proceedings to begin.

We cannot imagine any trial strategy which would protect counsel's actions in this case. Counsel failed to call a witness who, in opening statement, he told the jury would corroborate the defendant's claim that he was not driving at the time of the accident. He cross-examined the police officer eyewitnesses by asking them whether they had ever made statements to Smith or Wesolek which contradicted their trial testimony. The officers denied ever making the contradictory statements. Additionally, after investigating the accident, traffic accident specialists Smith and Wesolek concluded that both victims were front seat passengers. Yet, counsel never called or even subpoenaed Wesolek or Smith. Moreover, at trial he discovered that Bennon and Juska also had made these contradictory statements to Hanson. Despite persistent hinting and prodding by the trial judge, counsel failed to seek any remedy for this violation of discovery.

The State clearly and concisely set forth its case against defendant with the pivotal testimony of Bennon and Juska, who allegedly were the sole eyewitnesses to what transpired; the police reports reveal, however, that they perhaps witnessed nothing. Defense counsel was aware of three witnesses whose testimony could completely impeach Bennon and Juska; yet, counsel did not call any of these officers as witnesses. Instead of calling these witnesses, he stipulated to their testimony in what takes up all of 2½ pages of transcript. He was aware of both Smith and Wesolek prior to trial, yet neither was under subpoena. He was informed of Hanson's existence during trial, yet did not request a continuance to locate Hanson and bring him in to testify. He also did not ask that Bennon and Juska be recalled to further impeach them with Hanson's report. At a minimum, counsel should have asked for a mistrial.

A stipulation is a "time-saving" device used to admit necessary, but foundational or peripheral evidence which both parties to the litigation concede the truth of and which, obviously, is not a point of contention between the parties. A stipulation is no match for in-court live impeachment and is not properly used for that purpose. A reasonable standard of representation dictates that defense counsel subject the State's case to "meaningful adversarial testing" and that these officers be confronted with their prior, inconsistent statements before the eyes of the trier of fact.

Our learned colleague believes that, in effect, we are second-guessing defense counsel's trial strategy. However, we cannot agree that failure to recall Bennon and Juska to cross-examine them about Hanson's report and failure to call even one of the three officers defense counsel was aware of whose testimony would contradict Bennon and Juska was "trial strategy." Although we recognize that there is a "strong presumption" that counsel's actions were part of a valid trial strategy and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way" (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065), we are confident that no competent attorney would have defended his client in this manner. In today's overcrowded courtrooms, saving time is a valid concern in criminal trials; however, we believe that counsel's concern for an expeditious proceeding goes too far when, other than putting the defendant on the stand to deny his guilt, counsel presents defendant's entire defense through stipulation.

Regarding the prejudice factor under *Strickland*, we believe that counsel's failure to exact full mileage from the impeaching police reports seriously undermined the adversarial process "that our system

counts on to produce just results." (*Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) A verdict of guilt should be determined by a jury only after the complete truth has been presented to it in a meaningfully adversarial proceeding. As the case stands now, the jury was presented with the well-polished and well-rehearsed testimony of two uniformed officers testifying 2½ years after the accident. The police reports of at least three other officers illustrate, however, that within hours after the event both Bennon and Juska made statements in direct opposition to their trial testimony. In the absence of Bennon's and Juska's testimony, there is no direct evidence that places defendant in the driver's seat of the Plymouth.

Under the circumstances of this case, we conclude that reading the cold facts from the police reports into the record as a stipulation the day after the State rested and just before defendant put on his defense was no substitute for live, in-court impeachment of the police officers who, in effect, were the State's only "eyewitnesses" to the accident. We find the statements in the reports to be completely impeaching, or so much so that there is a reasonable probability that a different verdict may have been rendered. Accordingly, we reverse defendant's convictions and remand this cause for a new trial. In light of the fact that we have granted defendant a new trial, we need not address defendant's second contention on appeal which asserted that he was prejudiced by the State's failure to tender the police reports until after the prosecutor had presented his case.

For the foregoing reasons, the convictions of the circuit court of Cook County are reversed and the cause is remanded for a new trial.

Reversed and remanded.

CAMPBELL, J., concurs.

PRESIDING JUSTICE MANNING, dissenting:

The majority has chosen to *sua sponte* raise and rule upon the issue of whether or not the defendant received the effective assistance of counsel at trial. While I certainly support the court's obligation and right to *sua sponte* raise issues, especially in criminal cases, where the ends of justice so demand, I disagree that the instant case is an appropriate one to do so because of the factual matrix.[1]

---

[1]The court at oral argument *sua sponte* raised a question regarding the performance of counsel at trial. Both sides responded and were subsequently granted leave to file supplemental briefs addressing the issue of ineffective assistance of counsel.

As is shown in the majority opinion, defense counsel chose to stipulate to the contents of police reports which contained contradictory information to that of the trial testimony of the two sole eyewitnesses. As the majority so aptly points out, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 980 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

Our supreme court has stated that effective assistance of counsel refers to competent, not perfect, representation, and that mistakes in trial strategy, or tactics, or judgment do not of themselves render representation ineffective. (*People v. Stewart* (1984), 104 Ill. 2d 463, 491-92, 473 N.E.2d 1227, 1240.) In the instant case, trial counsel's maneuver could have been an attempt to place the inconsistent reports before the jury without giving the witnesses an opportunity to offer an explanation for the inconsistency. We must look to the totality of trial counsel's performance in determining ineffectiveness claims. (*People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270; *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) Defense counsel set forth a defense, challenged the credibility and perceptions of the People's witnesses, and performed in a generally reasonable and competent manner.

The majority has set forth a strategy which perhaps it, as well as many criminal lawyers, may have followed. That, however, is not the standard. The jurors, contrary to the majority's statement, were fully apprised that these uniformed officers had made contradictory statements. They were fully apprised because the State entered into a stipulation with defense attorney and the stipulation, setting forth the contradictory statements, was read aloud, in open court to the jurors. The triers of fact, notwithstanding the contradictions, and in full compliance with their duty as jurors, weighed all of the evidence including the physical evidence relating to the damage to defendant's car, injuries to the victims' bodies, and the scrape marks on the concrete wall, and decided adversely to the defendant. We must assume that the jury considered the impeachment, but nevertheless decided credibility in favor of the State. I am not convinced that the defense counsel's failure to recall the officers to cross-examine them was not trial strategy.

Additionally, I am not convinced that, assuming the failure was error, the outcome would have differed in light of the totality of the evidence presented by the State.

Accordingly, I would affirm.