2023 IL App (1st) 220381-U

No. 1-22-0381

Order filed June 2, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 18 CR 9701 |
| | ) | |
| MICHAEL ELDRIDGE, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Justices Mitchell and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's convictions for aggravated criminal sexual assault and aggravated kidnaping where his trial counsel did not provide ineffective assistance and any alleged error in the trial court conducting a preliminary inquiry under *People v. Krankel*, 102 Ill. 2d 181 (1984) was harmless.

¶ 2    Following a jury trial, defendant Michael Eldridge was found guilty of three counts of aggravated criminal sexual assault and one count of aggravated kidnaping. The trial court sentenced him to 4 consecutive terms of 7 years' imprisonment for a total of 28 years'

imprisonment. On appeal, defendant contends that: (1) his trial counsel provided ineffective assistance where counsel failed to properly impeach the victim and called his mother to testify despite her testimony being affirmatively damaging; and (2) the trial court failed to hold an adequate preliminary inquiry under *People v. Krankel*, 102 Ill. 2d 181 (1984) to examine the basis of two of his claims of ineffective assistance of counsel. For the reasons that follow, we affirm defendant's convictions.

¶ 3                                    I. BACKGROUND

¶ 4        A grand jury indicted defendant with several counts of aggravated criminal sexual assault, aggravated kidnaping, armed robbery, aggravated vehicular hijacking and vehicular invasion based on his conduct toward R.B. The State proceeded to trial against defendant on Counts 1, 2, 3 and 22, and nolle-prossed the remaining counts. Counts 1, 2 and 3 alleged that defendant committed aggravated criminal sexual assault by committing sexual penetration on R.B. through force or the threat of force, and threatened or endangered her life. Count 22 alleged that defendant committed aggravated kidnaping by carrying R.B. from one place to another with the intent to secretly confine her against her will and did so while committing a robbery. In defendant's answer to discovery, he asserted that he may raise the defense of consent.

¶ 5        During pretrial proceedings, an assistant State's Attorney informed the trial court that trial counsel had his law license suspended for three months while defendant's case was ongoing. According to the court, during an off-the-record discussion, trial counsel acknowledged the suspension and noted that colleagues of his had made appearances on his behalf during the suspension. The court further indicated that defendant acknowledged trial counsel had disclosed the suspension to him. The case ultimately proceeded to a jury trial.

¶ 6                                  A. The State's Case

¶ 7    At trial, R.B. was the sole direct witness to defendant's alleged conduct. The evidence showed that, in June 2018, R.B. lived in Chicago with her children. In the evening of June 9, 2018, R.B. parked her vehicle in front of her house with her driver's side window cracked open. While parked, she was on the phone with Melron Davis, the father of two of her children, when a male identified at trial as defendant approached the driver's side window and pointed a firearm at her head. Defendant, who R.B. had never met before, told her to give him everything she had. R.B. responded that she did not have anything, so defendant told her to give him her iPhone, which she did. R.B. observed defendant terminate her phone call with Davis, who at trial testified that, while he was talking to R.B., the call ended abruptly. After taking her phone, defendant entered the vehicle on the passenger's side and took R.B.'s "Link" card. R.B. also gave defendant $5 and the pin number to the Link card after defendant asked. Defendant also demanded that R.B. take him inside her house, but she refused because her children were inside. As a result, defendant told her to drive into a nearby alley, and she parked behind a vacant house. When there, defendant instructed R.B. to pull down her pants. R.B. complied, and defendant proceeded to penetrate her sexually multiple times while threatening to kill her if she did not comply. Once he stopped, defendant told R.B. to drive him a few blocks away, where he exited her vehicle. Defendant threatened to kill her and her children if she called the police, and he walked away from her vehicle.

¶ 8    R.B. immediately drove to a Dollar General store, where she flagged down a woman and informed the woman what occurred. That woman called the police. Chicago Police Officer Leshawn Hawkins arrived at the scene, and observed R.B. "crying uncontrollably" and unable to speak. Eventually, R.B. told Officer Hawkins what occurred, after which an ambulance transported her to the hospital. At the hospital, R.B. told Chicago Police Detective Partiece Walker what happened and provided a description of defendant. Detective Walker noticed that R.B. was

- 3 -

"nervous," "upset" and "crying." Davis learned that R.B. was at the hospital and went there, where he observed that she was "crying" and "traumatized." Nurse Letitia Hill-Brandon treated R.B. and initially observed that she "looked like she had been previously crying," although she was "alert and oriented." R.B. told Hill-Brandon what occurred, including that she was sexually assaulted by defendant, and he threatened to kill her and her children if she did not cooperate. Hill-Brandon performed a sexual assault kit on R.B. and Hill-Brandon noted that R.B. did not have any visible tearing or other physical injuries to her private parts.

¶ 9    The following day, R.B. checked her Link account online and noticed that it had been recently used at a gas station. She contacted the police, and Detective Walker took her to the gas station, where they reviewed security footage from the time in which R.B.'s Link card was used. While watching the video, R.B. recognized defendant and identified him as the individual who attacked her. According to Detective Walker, upon seeing defendant in the video, R.B. began "shaking" and "crying." Detective Walker generated a community alert with a still photograph of defendant from the video. A few days later, defendant turned himself in to the police. Thereafter, R.B. went to the police station to view a lineup. According to Detective Walker, when R.B. arrived, she was normal and relaxed. Chicago Police Detective Marcus Shepard, who had R.B. sign a lineup advisory form, noticed that she was calm and not crying initially. However, according to Detective Shepard, once she entered the room to view the lineup, she immediately became "dysfunctional," "upset," and "almost immediately pointed at [defendant] and began to cry." When she left the room, Detective Walker observed that R.B. was "highly upset, crying" and "shaking."

¶ 10    An evidence technician collected DNA evidence from R.B.'s vehicle, including the steering wheel and seat covers in the front. DNA analysis of the samples, however, showed either minor contributors that could not be separated or samples not suitable for comparison.

Additionally, forensic testing did not reveal the presence of semen in the front of R.B.'s vehicle. At the conclusion of R.B.'s trial testimony, she denied that she ever gave defendant consent to sexually penetrate her or take her personal items.

¶ 11                                    B. The Defense's Case

¶ 12    In the defense's case, Khaliah Whisenton testified that she and defendant had been dating on and off since 2017, but were currently together and shared two children. In June 2018, however, they were not together. They would often fight about each other texting other people, which led to their "off" periods. At trial, Whisenton denied that she spoke with defendant about her testimony and denied that he ever told her what to say. Janeice Kimbrough, defendant's mother, testified that she lived in Chicago and he lived with her in June 2018. During that month, Kimbrough saw "a lot of women" in her house with defendant. At trial, trial counsel gave Kimbrough a photograph of R.B. and asked if she recognized the woman. Kimbrough responded that R.B. "look[ed] kind of familiar" but added that she did not "really" look at the women defendant brought home. Kimbrough also testified that she had security cameras outside of her house, including one pointed at the front door and one pointed at the back door. According to Kimbrough, while she did not see every woman who came into her house with defendant, she "kn[e]w that there's someone's [*sic*] there" based on the cameras.

¶ 13    Defendant testified that, in 2017, he met R.B. in their neighborhood. Over the next year, they met up multiple times at Kimbrough's house, hung out and had consensual sexual intercourse. Although defendant acknowledged never having R.B.'s phone number, he explained that he did not need it because they lived in the same neighborhood and would see each other on the street. Defendant added that having too many women's phone numbers could complicate a current relationship. In the evening of June 9, 2018, defendant had an argument with Nataza, the mother

of one of his children and whose last name was not stated at trial, so he left Kimbrough's house and began sitting outside on the porch when R.B. walked by. After having a brief conversation, they went into Kimbrough's house and watched television. Soon thereafter, they began to have consensual sexual intercourse. Afterward, they had a short conversation about defendant being in a relationship with another woman, which led to R.B. leaving the house "highly upset." Later in the night, a female friend and romantic partner of defendant's came over, and they drove to a gas station where she bought some food using a Link card. They returned to Kimbrough's house afterward. On June 20, 2018, defendant learned he was wanted for multiple criminal offenses, which caused him to turn himself in to the police. At trial, defendant agreed telling Kimbrough that he was anxious about the results of the DNA test in his case. Defendant explained that he was anxious because he had seen people wrongly convicted of sexual assault, and he was only 18 years old at the time. Defendant also agreed that there would be video of R.B. coming to and leaving Kimbrough's house on the evening of June 9, 2018, as well as other times.

¶ 14　In defendant's case, the parties stipulated if R.B. were called as a witness, she would testify that, on June 21, 2018, she gave an electronically recorded interview to Detective Walker and a Cook County assistant State's Attorney. During that conversation, R.B. told them that defendant demanded her iPhone, but she said no. R.B. also would testify that defendant told her to take her pants off multiple times but she refused, and he told her to unbutton her pants, but she also refused.

¶ 15　　　　　　　　C. Verdict and Posttrial

¶ 16　Following closing arguments, the jury found defendant guilty on all four counts. Defendant, through trial counsel, filed a motion for new trial. While the motion was pending, defendant sent the trial court a handwritten letter asserting that trial counsel had been ineffective for several reasons. At a subsequent court appearance, the court asked defendant what he believed

his counsel did wrong. After making multiple allegations, including one about his counsel's law license being suspended, defendant claimed that counsel failed to visit him in jail despite his requests and failed to respond to phone communications from him, his girlfriend and Kimbrough, though defendant did not explain how this affected his case. The court asked counsel about the allegations, and counsel responded that "[t]here was a problem with communicating over the phone," though counsel did not pinpoint why there was a problem. Counsel, however, was adamant that he met with defendant "[p]robably 20 times," including 5 times specifically in anticipation of defendant testifying at trial. Defendant disagreed and asserted that counsel only met with him twice, including only one time to prepare for trial. Defendant contended that his jail visitor logs would buttress his claim. The court agreed, and in order to resolve the conflicting assertions about how frequently counsel visited defendant in jail, it instructed counsel to obtain defendant's jail visitor logs. During this appearance, the court found multiple claims of defendant's meritless or pertaining to trial strategy.

¶ 17 At the following court appearance, trial counsel indicated that he had not subpoenaed the visitor logs, but rather called someone at the jail about obtaining the logs and that person had not responded. The court gave trial counsel additional time to obtain the logs, but noted that it would draw "a negative inference" if counsel failed to subpoena them. On the date of the next court appearance, trial counsel filed a motion for leave to withdraw due to "irreconcilable differences." Counsel included an affidavit in his motion indicating that, based on his records, he visited defendant 12 times to discuss "strategy, discovery, and testimony," the majority of which were in "the lock up area behind the courtroom." The court granted counsel's motion and appointed the public defender's office to represent defendant until he decided if he was going to retain new, private counsel. At the subsequent court appearance, private counsel appeared, resulting in the

court granting the public defender's office leave to withdraw. The court provided a summary of the posttrial proceedings in the case with new counsel present. The court noted that defendant had made allegations of ineffective assistance of trial counsel and trial counsel had withdrawn from the case. The court continued the matter to give new counsel time to become acquainted with the case. During another court appearance, new counsel indicated to the court that she needed additional time to review the materials and to have a meeting with defendant in order to prepare an additional motion for new trial.

¶ 18    Defendant, through his new counsel, filed an addendum to his initial motion for new trial and raised a claim of ineffective assistance of trial counsel due to the suspension of trial counsel's law license. During the hearing on the addendum, in which a second private counsel appeared on defendant's behalf, the trial court reviewed the proceedings and observed that it previously held a hearing on defendant's claims of ineffective assistance of trial counsel. His new counsel informed the court that defendant had an opportunity to review the addendum and the initial motion for new trial. The court asked him if the motions "fully encompass[ed] the issues" he "wish[ed] to raise?" Defendant replied affirmatively. New counsel, though, added that, based on a recent meeting with defendant, they wanted to raise additional claims related to trial counsel's decisions to stipulate to various evidence. The court told counsel to incorporate all posttrial claims into a single motion.

¶ 19    Eventually, defendant, through new counsel, filed a supplemental motion for new trial that incorporated trial counsel's initial motion for new trial and raised multiple claims of ineffective assistance of trial counsel, though none related to trial counsel's lack of communication and visitation with defendant. Defendant did claim that counsel was ineffective due to his law license being suspended and by agreeing to stipulate to various evidence, including to the testimony of R.B. Following a hearing, the trial court denied defendant's supplemental motion for new trial.

The court subsequently sentenced defendant to 4 consecutive terms of 7 years' imprisonment for a total of 28 years' imprisonment. This appeal followed.

¶ 20                                    II. ANALYSIS

¶ 21                        A. Ineffective Assistance of Trial Counsel

¶ 22    Defendant first contends that his trial counsel provided ineffective assistance where counsel called Kimbrough, his mother, to testify despite her testimony being affirmatively damaging and counsel failed to properly impeach R.B. with her prior inconsistent statements.

¶ 23    The United States and Illinois Constitutions guarantee a defendant the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. When evaluating claims of ineffective assistance of counsel, the defendant must satisfy the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Gayden*, 2020 IL 123505, ¶ 27. Under the test, the defendant must establish that his counsel's performance was deficient and the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687. More specifically, the defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unreasonable performance, the result of the proceeding would have been different. *Gayden*, 2020 IL 123505, ¶ 27. To prevail on a claim of ineffective assistance of counsel, the defendant must prove both prongs of the *Strickland* test. *Id.* We review whether the defendant received ineffective assistance of counsel *de novo*. *People v. Johnson*, 2021 IL 126291, ¶ 52.

¶ 24                            1. Testimony of Kimbrough

¶ 25    Defendant first argues that trial counsel performed deficiently by calling Kimbrough, his mother, to testify because her testimony affirmatively damaged the defense. Defendant highlights that, when discussing Kimbrough's forthcoming testimony with the trial court, trial counsel

indicated that she would be able to identify R.B. as someone she had seen in her house. However, during Kimbrough's testimony, when asked by trial counsel if she recognized a photograph of R.B., Kimbrough testified that she "look[ed] kind of familiar." Additionally, defendant highlights that trial counsel elicited testimony from Kimbrough that her house had security cameras, which recorded people coming and going. Defendant notes that this testimony was used by the State while cross-examining him, where he agreed that the footage from those security cameras would have shown R.B. coming and going from the house on June 9, 2018, as well as the previous instances of them meeting. Defendant points out that, despite his testimony, trial counsel failed to produce any videos of R.B. coming and going from the house.

¶ 26     Under the deficiency prong of *Strickland*, the "defendant must show that his counsel's performance was so inadequate that counsel was not functioning as the counsel guaranteed by the sixth amendment." (Internal quotation marks omitted.) *People v. Dupree*, 2018 IL 122307, ¶ 44. A defendant is not guaranteed perfect counsel, but rather only competent counsel. *People v. Easley*, 192 Ill. 2d 307, 344 (2000). As a result, mistakes in judgment or trial strategy do not mean counsel performed deficiently. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). The decisions about what witnesses to call and what evidence to present are matters of trial strategy. *People v. Munson*, 206 Ill. 2d 104, 139 (2002). When reviewing counsel's actions, we must review his "performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). And thus, the defendant "must overcome the strong presumption that any challenged action or inaction may have been the product of sound trial strategy," which "is a high bar to clear since matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *Dupree*, 2018 IL 122307, ¶ 44.

¶ 27    Trial counsel's decision to call Kimbrough as a witness did not demonstrate deficient representation because her testimony did not affirmatively damage the defense. Rather, her testimony supported the defense that defendant was a womanizer, had consensual sex with R.B. and she falsely accused him of sexual assault because he was in a relationship with another woman. As defendant highlights, based on proceedings outside the presence of the jury, trial counsel informed the trial court that Kimbrough would positively identify R.B. as a woman she had seen in her house before. However, during a sidebar while Kimbrough was testifying, counsel indicated he was actually unsure if Kimbrough would be able to identify R.B. Ultimately, during Kimbrough's testimony, counsel gave her a photograph of R.B. and asked her if she recognized the woman in the photograph. Kimbrough responded that R.B. "look[ed] kind of familiar" but added that she did not "really" look at the women defendant brought home. Better practice would have been to know definitely whether Kimbrough could have identified R.B. But Kimbrough still ended up answering that R.B. looked familiar, which helped the defense by providing an inference that she recognized R.B. because R.B. had been in his Kimbrough's house previously. Thus, Kimbrough's testimony about R.B. still advanced the defense and buttressed defendant's claim that he and R.B. engaged in consensual sex. Indeed, had counsel known that Kimbrough would only testify that R.B. looked familiar, it would have been reasonable to present that testimony given the nature of the defense. While counsel should have known definitely if Kimbrough could identify R.B. before asking her the question at trial, counsel performed reasonably given that Kimbrough's testimony was still helpful to the defense. See *People v. Fuller*, 205 Ill. 2d 308, 331 (2002) (asserting that, because "[a] defendant is entitled to reasonable, not perfect, representation" from counsel, "mistakes in strategy or in judgment do not, of themselves, render the representation incompetent").

¶ 28　Concerning trial counsel's elicitation from Kimbrough that she had security cameras outside her house pointed at the front and back doors, this evidence also did not affirmatively damage the defense. While counsel did not provide any video evidence of R.B coming and going from the house of defendant's mother, this lack of evidence was offset by the fact that the security cameras helped explain why Kimbrough had seen "a lot of women" at her house with defendant, buttressing the defense's claim that defendant was a womanizer, had consensual sex with R.B. and she falsely accused him of sexual assault because he was in a relationship with another woman. Given the consent defense and because the decision on what witnesses to present is a matter of trial strategy generally immune from ineffective assistance of counsel claims (see *Dupree*, 2018 IL 122307, ¶ 44; *Munson*, 206 Ill. 2d at 139), trial counsel's decision to present Kimbrough as a witness was not unreasonable.

¶ 29　Nevertheless, defendant likens trial counsel's decision to call Kimbrough as a witness to the decisions of trial counsels in *People v. Baines*, 399 Ill. App. 3d 881 (2010), *People v. Bailey*, 374 Ill. App. 3d 608 (2007), *People v. Moore*, 356 Ill. App. 3d 117 (2005) and *People v. Valentine*, 299 Ill. App. 3d 1 (1998), in which this court found ineffective assistance of trial counsels. In *Baines*, 399 Ill. App. 3d at 888-99, trial counsel committed several egregious errors in rendering ineffective assistance, including repeatedly asking questions of the defendant that helped the State's case, being mistaken about the circumstances of the victim's identification, failing to ask obvious follow-up questions and demonstrating a lack of understanding of the basic facts of the case. In *Bailey*, 374 Ill. App. 3d at 614-15, where the defendant had been charged with possession of a controlled substance with intent to deliver and the State did not present evidence of "the factors usually associated with an intent to deliver, *i.e.*, the amount of the drugs, paraphernalia, or packaging," trial counsel elicited key evidence on cross-examination of a police officer that the

State did not elicit on direct examination, which linked the defendant to a man on the corner of a street yelling " 'rocks' " at passing cars.

¶ 30    In *Moore*, 356 Ill. App. 3d at 119, 123, where the defendant had been charged with burglary, the State presented no evidence about the recovery of the camera bag the defendant allegedly stole from a vehicle. However, on cross-examination of two of the State's witnesses, trial counsel elicited inadmissible hearsay from them that two people near the scene of the alleged crime, who did not testify at trial, told them they saw the defendant drop the camera bag during a struggle and someone associated with the defendant took the bag. *Id.* at 123. "Without that explanation for the missing camera bag, the facts supported the argument that [the State's witnesses], who identified [the] defendant as having burglarized [a vehicle], were mistaken because [the] defendant was neither in possession of the camera bag when he was arrested, nor was the camera bag found anywhere in the area." *Id.* Lastly, in *Valentine*, 299 Ill. App. 3d at 2-3, where the defendant had been charged with aggravated battery and unlawful restraint but argued at trial he was defending himself, trial counsel's line of questioning of the defendant gave the jury the impression that he was a nonviolent person. Due to this misleading insinuation and under the doctrine of completeness, the trial court allowed the State to impeach the defendant with evidence that he had been arrested for battery multiple times. *Id.* at 3.

¶ 31    In the instant case, in contrast with *Baines*, *Bailey*, *Moore* and *Valentine*, trial counsel's actions in presenting Kimbrough did not affirmatively damage the defense. Rather, as discussed, her testimony supported the defense that defendant was a womanizer, had consensual sex with R.B. and she falsely accused him of sexual assault because he was in a relationship with another woman. Thus, *Baines*, *Bailey*, *Moore* and *Valentine* are inapposite. Because trial counsel's

decision to call Kimbrough as a witness was not objectively unreasonable, counsel did not provide ineffective assistance of counsel for that decision. See *Gayden*, 2020 IL 123505, ¶ 27.

¶ 32                                    2. Impeachment of R.B.

¶ 33    Defendant next argues that trial counsel performed deficiently during counsel's attempt to impeach R.B. First, defendant posits that counsel failed to confront R.B. with her prior inconsistent statements during cross-examination. Second, defendant asserts that counsel demonstrated his lack of knowledge of impeachment when attempting to use the electronically recorded interview of R.B. And third, defendant claims that counsel diminished the effect of R.B.'s impeachment by entering the impeaching evidence through a stipulation rather than live testimony.

¶ 34    Although defendant disputes the aptness of trial counsel's actions regarding the impeachment of R.B., there is no dispute that the impeachment concerned minor inconsistencies between what she testified to at trial and what she told Detective Walker and an assistant State's Attorney during the electronically recorded interview. At trial, R.B. testified that defendant told her to give him everything, and she responded that she did not have anything. R.B. further testified that defendant told her to give him her iPhone, which she did. However, during her electronically recorded interview, as stipulated at trial, R.B. stated that defendant told her to give him her iPhone and she said no. Additionally, at trial, R.B. testified that, after parking in the alley, defendant told her to pull her pants down, and she complied. However, during her electronically recorded interview, as stipulated at trial, R.B. stated that defendant told her to take her pants off multiple times but she refused, and he told her to unbutton her pants, but she also refused.

¶ 35    These minor inconsistencies are collateral and understandable given the traumatic experience R.B. endured. See *People v. Brooks*, 187 Ill. 2d 91, 133 (1999) (observing that minor variations in witness testimony can be expected when the testimony relates to "traumatic

- 14 -

circumstances"). None of the inconsistencies concern material aspects of the case, and they do not detract from the reasonableness of R.B.'s story as a whole. See *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 84 (observing that minor inconsistencies in a victim's testimony that do not detract from the victim's overall story do not materially impugn the victim's credibility). This is especially true where, as in this case, there is corroborating evidence that defendant sexually assaulted and kidnaped R.B., such as her immediate reporting of the attack to a witness, police and medical professionals, and her emotional distress when recounting the attack. See *In re C.K.M.*, 135 Ill. App. 3d 145, 150 (1985) (corroboration of sexual assault included the victim's "emotional distress evidenced by her crying"); *People v. Bivens*, 101 Ill. App. 3d 8, 11 (1981) (asserting that inconsistencies in a sexual assault victim's testimony were minor in light of her "immediate report of the rape to [a] bus driver and police"). Thus, assuming *arguendo* that trial counsel had been deficient for failing to properly impeach R.B. with her prior inconsistent statements, a reasonable probability does not exist that defendant would have been found not guilty given the impeachment evidence concerned only minor inconsistencies and did not detract from the reasonableness of R.B.'s story as a whole. See *Gayden*, 2020 IL 123505, ¶ 27.

¶ 36    Nonetheless, defendant relies on multiple cases—*People v. Williams*, 329 Ill. App. 3d 846 (2002), *People v. Mejia*, 247 Ill. App. 3d 55 (1993), *People v. Skinner*, 220 Ill. App. 3d 479 (1991) and *People v. Garza*, 180 Ill. App. 3d 263 (1989)—to argue that his trial counsel was ineffective for failing to properly impeach R.B. In *Williams*, 329 Ill. App. 3d at 854-57 and *Garza*, 180 Ill. App. 3d at 267-70, this court found the evidence in both cases extremely close such that the errors by trial counsel in cross-examining witnesses and stipulating to evidence, among others, made the proceedings against the defendant unreliable. In *Mejia*, 247 Ill. App. 3d at 55-58, the defendant had been charged with reckless homicide for allegedly killing two occupants of the vehicle he was

driving that had crashed. During trial, trial counsel stipulated to the testimony of two police major accident specialists and another officer who spoke to the officers who had been following the vehicle before it crashed, which casted doubt about the defendant being the driver of the vehicle and in fact, placed him in the backseat of the vehicle at the time of the crash. *Id.* at 60-61. This court found the stipulated evidence "to be completely impeaching, or so much so that there is a reasonable probability that a different verdict may have been rendered." *Id.* at 66. Unlike in *Williams*, *Garza* and *Mejia*, the alleged error by trial counsel in this case related to impeaching R.B. based on minor inconsistencies in her testimony, which did not detract from the reasonableness of her story as a whole, and thus, did not prejudice defendant.

¶ 37 Lastly, in *Skinner*, 220 Ill. App. 3d at 483-87, trial counsel committed multiple errors that cumulatively resulted in prejudice to the defendant. In the instant case, in contrast to *Skinner*, because trial counsel did not act deficiently in calling Kimbrough as a witness, there is no potential cumulative effect issue. As such, defendant's reliance on *Williams*, *Mejia*, *Skinner* and *Garza* is unpersuasive. Because defendant was not prejudiced by trial counsel's allegedly deficient performance in impeaching R.B., counsel did not provide ineffective assistance based on the impeachment of her. See *Gayden*, 2020 IL 123505, ¶ 27.

¶ 38 Defendant further argues in the alternative that posttrial counsel was ineffective for failing to include claims about trial counsel's ineffectiveness for improperly impeaching R.B. and calling Kimbrough as a witness in his supplemental motion for new trial. However, where we have found that trial counsel was not deficient for calling Kimbrough as a witness and there was no prejudice for counsel's alleged errors related to the impeachment of R.B., posttrial counsel cannot be deemed ineffective for failing to include those claims in defendant's supplemental motion for new trial, as raising them would have been futile. See *People v. Boston*, 2018 IL App (1st) 140369, ¶ 144.

¶ 39                                    B. *Krankel*

¶ 40     Defendant next contends that the trial court erred by failing to hold an adequate preliminary

inquiry under *Krankel*, 102 Ill. 2d 181, to examine the basis of his claims that trial counsel provided

ineffective assistance by only visiting him in jail twice and communicating with him poorly.

¶ 41     In *Krankel* and its progeny, our supreme court provided a framework for addressing *pro se*

posttrial claims of ineffective assistance of counsel. *People v. Roddis*, 2020 IL 124352, ¶ 34. After

a defendant raises such claims, the trial court does not automatically appoint the defendant new

counsel. *Id.* ¶ 35. Instead, the court must initially examine the factual basis underlying the claims.

*Id.* In this initial inquiry, "some interchange between the trial court and trial counsel regarding the

facts and circumstances surrounding the allegedly ineffective representation is permissible and

usually necessary in assessing what further action, if any, is warranted on a defendant's claim."

*People v. Moore*, 207 Ill. 2d 68, 78 (2003). The court may also discuss the allegations with the

defendant, and it may base its assessment of the claims using its knowledge of trial counsel's

performance. *People v. Jolly*, 2014 IL 117142, ¶ 30. "This procedure serves the narrow purpose

of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's

*pro se* posttrial ineffective assistance claims [citation] and is intended to promote consideration of

*pro se* ineffective assistance claims in the trial court and to limit issues on appeal." (Internal

quotation marks omitted.) *People v. Jackson*, 2020 IL 124112, ¶ 95.

¶ 42     If the trial court concludes that the defendant's claims lack merit—either factually or

legally—or relate only to issues of trial strategy, then it does not need to appoint new counsel and

can deny the *pro se* claims. *Roddis*, 2020 IL 124352, ¶¶ 35, 50, 61. But if the allegations

demonstrate potential neglect by trial counsel, the court should appoint the defendant new counsel

(*id.* ¶ 35), who then can represent the defendant at a hearing on his *pro se* claims of ineffective

assistance of trial counsel. *Jackson*, 2020 IL 124112, ¶ 97. "The appointed counsel can independently evaluate the *pro se* claim[s] and avoid the conflict of interest that defendant's trial counsel would experience in trying to justify his or her actions contrary to the defendant's position." *Id.* New counsel has an obligation to present the claims that have merit to the trial court. *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 49. Whether the trial court properly conducted a preliminary inquiry under *Krankel* is a question of law, which we review *de novo*. *Jackson*, 2020 IL 124112, ¶ 98.

¶ 43 After defendant sent his *pro se* letter to the trial court raising claims of ineffective assistance of trial counsel, the trial court conducted a preliminary inquiry into these claims, where defendant raised additional claims that counsel only visited him twice in jail and generally communicated with him poorly via the phone. The court asked counsel about the claims, and he responded that he visited with defendant approximately 20 times, including five times specifically in anticipation of defendant testifying at trial. Defendant maintained that the assertion was not true. Counsel also acknowledged an issue regarding phone communication, though could not pinpoint why there was a problem.

¶ 44 By asking trial counsel to respond to defendant's claims and following-up with further questions about the claims as well as allowing defendant to offer additional commentary on the issues, the court conducted a substantial examination into the underlying factual nature of the claims. "The purpose of the preliminary inquiry is to ascertain the underlying factual basis for the ineffective assistance claim and to afford a defendant an opportunity to explain and support his claim." *People v. Ayres*, 2017 IL 120071, ¶ 24. In fact, to fully explore defendant's visitation claim, the court ordered trial counsel to subpoena jail visitation records. We acknowledge that the court never ultimately rejected this claim or the phone communication claim as meritless. But when trial

counsel withdrew and defendant retained new private counsel, new counsel filed the addendum to defendant's motion for new trial, which included a claim of ineffective assistance of trial counsel. After filing the addendum, new counsel informed the court that defendant had an opportunity to review the document and his initial motion for new trial. The court asked defendant whether those motions "fully encompass[ed] the issues" he "wish[ed] to raise," and defendant responded affirmatively. Perhaps, based on defendant's response, the court believed that he had abandoned his pending *pro se* visitation and communication claims of ineffective assistance of counsel, and thus, obviating the need to explicitly reject them. However, even if the court's failure to explicitly reject these claims as meritless was an error, that error was cured by defendant's retention of new counsel under the specific circumstances of this case.

¶ 45    During new counsel's first court appearance, the trial court provided a summary of the posttrial proceedings in the case and noted that defendant had made allegations of ineffective assistance of trial counsel. While new counsel was in the process of becoming familiar with the case, she requested a continuance for additional time to review the materials in the case and to have a meeting with defendant in preparation for a motion for new trial. Counsel ultimately presented a supplemental motion for new trial on defendant's behalf that included multiple claims of ineffective assistance of trial counsel, meaning new counsel reviewed trial counsel's actions. And defendant ultimately received the best-case scenario following the preliminary inquiry under *Krankel*, which was new counsel to independently investigate his *pro se* claims and determine if any of them had merit and warranted further presentation to the court. See *Moore*, 207 Ill. 2d at 78. The fact that new counsel did not include defendant's *pro se* claims related to the communication and visitation issues are an indication the claims were meritless. See *Downs*, 2017 IL App (2d) 121156-C, ¶ 49 (post-*Krankel* counsel has an obligation to present to the trial court

any *pro se* claims that have merit). For instance, new counsel could have determined that, based on trial counsel's affidavit filed in conjunction with his motion for leave to withdraw where he averred to visiting defendant 12 times, it would have been futile to raise such a claim, especially where defendant never presented any argument about how additional communication would have led to the jury finding him not guilty. See *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 64 (where the record showed communication between the defendant and his trial counsel, and the defendant did "not explain[] how additional pretrial communication with [trial counsel] would have altered the outcome of his case," the defendant did not receive ineffective assistance of counsel); *People v. Johnson*, 372 Ill. App. 3d 772, 777 (2007) (rejecting a defendant's claim of ineffective assistance of counsel for "his trial attorney allegedly never visit[ing] him in jail to discuss and prepare his case" where the defendant did not "allege[] that his attorney never discussed his case with him and did not demonstrate how personal visits at the jail would have been outcome determinative"). It is telling that, on appeal, defendant has not raised any contention that trial counsel was ineffective for failing to communicate with him or visit him in jail more than twice, or that posttrial counsel was ineffective for failing to pursue those claims of ineffective assistance of trial counsel in the supplemental motion for new trial.

¶ 46    Buttressing this notion, as discussed, defendant indicated to the trial court that he had an opportunity to review new counsel's addendum to his motion for new trial and further that the addendum and initial motion fully encompassed the issues that he wished to raise after trial. Although new counsel filed a supplemental motion for new trial on defendant's behalf, which added additional claims of ineffective assistance of trial counsel, the record demonstrates that defendant effectively abandoned the communication and visitation claims of ineffective assistance of trial counsel. Consequently, given the circumstances of new counsel's representation of

defendant and his own actions, any error by the trial court with respect to the preliminary *Krankel* inquiry was harmless. See *People v. Palomera*, 2022 IL App (2d) 200631, ¶¶ 63-64 (finding the trial court's failure to conduct a proper preliminary *Krankel* inquiry was harmless error).

¶ 47    This case is unlike the situation that occurred in *People v. Roberson*, 2021 IL App (3d) 190212, ¶ 20, which defendant relies upon, where the withdrawal of the defendant's trial counsel and subsequent appointment of new counsel did not moot the defendant's *Krankel* claim of error. There, the defendant raised several *pro se* posttrial claims of ineffective assistance of trial counsel. *Id.* ¶¶ 5, 9. Thereafter, trial counsel withdrew, and the trial court appointed defendant new counsel, who merely filed a motion to reconsider the defendant's sentence. *Id.* ¶¶ 10-11. During posttrial proceedings, the court never examined the factual basis underlying any of the defendant's *pro se* claims. *Id.* ¶¶ 5-11. On appeal, the defendant claimed that the court failed to conduct a preliminary *Krankel* inquiry. *Id.* ¶ 13. We agreed because the court never asked the defendant or trial counsel any questions about his specific claims of ineffective assistance of trial counsel. *Id.* ¶¶ 18-19.

¶ 48    The State, however, argued that trial counsel's withdrawal and the subsequent appointment of new counsel mooted the defendant's *Krankel* claim of error. *Id.* ¶ 20. We rejected this argument observing that the purpose of the appointment of new counsel following a preliminary *Krankel* inquiry was "specifically to investigate and pursue defendant's claims of ineffectiveness, as original counsel would have a clear conflict of interest in doing so." *Id.* We added that "the purpose of the *Krankel* procedure is not to provide a defendant with effective counsel going forward but to ensure that he received effective assistance previously." *Id.* This court noted that the defendant's new counsel was not appointed to investigate his *pro se* claims of ineffective assistance of trial counsel either implicitly or explicitly, and "[n]ew counsel plainly did not pursue any ineffectiveness claims in his motion to reconsider sentence, the only motion he filed while

- 21 -

representing [the] defendant." *Id.* ¶ 21. "As the appointment of new counsel did not result in any further litigation of defendant's ineffectiveness claims, it cannot be said that that appointment satisfied the requirements of *Krankel* and its progeny." *Id.*

¶ 49    In the instant case, unlike in *Roberson*, the trial court conducted a significant factual inquiry into defendant's communication and visitation claims, and new counsel was aware defendant had alleged claims of ineffective assistance of trial counsel. What's more, new counsel held a meeting with defendant to discuss posttrial matters, and new counsel filed a supplemental motion for new trial raising claims of ineffective assistance of counsel. Moreover, defendant effectively abandoned the communication and visitation claims by telling the court that new counsel's addendum to his initial motion for new trial contained all the issues he wished to raise posttrial. Therefore, the circumstances here and the actions of new counsel differ vastly from what occurred in *Roberson*.

¶ 50                                III. CONCLUSION

¶ 51    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 52    Affirmed.